478 F.2d 817
 Fed. Sec. L. Rep. P 93,984
Jacob SCHEIN and Marvin H. Schein, Plaintiffs-Appellants,
v.
Melvin CHASEN et al., Defendants-Appellees.
Antone F. GREGORIO, Individually and as representative of
all persons similarly situated as a class under
Rule 23, F.R.C.P., Plaintiff-Appellant,
v.
LUM'S, INC., et al., Defendants-Appellees.
 Nos. 81 and 82, Dockets 72-1373, 72-1375.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 17, 1972.
Decided May 10, 1973.
 
 Donald N. Ruby, Wolf, Popper, Ross, Wolf & Jones, New York City, for Schein and Gregorio.
 Schlifkin & Berman, Chicago, Ill., for Gregorio.
 Laura Banfield, David Hartfield, Jr., White & Case, New York City, for Simon.
 James J. Hagan, Simpson, Thacher & Bartlett, New York City, for Lehman Brothers.
 James M. Bergen, Allan R. Freedman, Donovan, Leisure, Newton & Irvine, New York City, for Investors Diversified Services, Inc., Investors Variable Payment Fund, Inc., and IDS New Dimensions Fund, Inc.
 Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.
 WATERMAN, Circuit Judge:
 
 
 1
 Plaintiffs-appellants are stockholders in Lum's, Inc., a Florida corporation primarily engaged in restaurant franchising. Invoking the diversity jurisdiction of the court, they sued derivatively in the Southern District of New York alleging that the defendants were jointly and severally liable to Lum's for actionable wrongs which the defendants had committed against Lum's. The individual defendants were Melvin Chasen, a resident of Florida, president of Lum's, Benjamin Simon, a stockbroker employed in Chicago, Ill. by defendant Lehman Brothers, Eugene S. Sit, portfolio manager of defendant IDS New Dimensions Fund, Inc., a Mutual Fund, and James R. Jundt, manager of defendant Investors Variable Payment Fund, Inc., a Mutual Fund. Each of the four individual defendants moved for dismissal on the ground that they had not been validly served under the New York Long Arm Statute (CPLR Secs. 313, 302(a)) and that the court below had no personal jurisdiction of them. Sit's and Jundt's motions were granted prior to the filing of the order appealed from, Chasen's was granted concurrently therewith, and Simon's has apparently not been acted upon.[1] The defendants Lehman Brothers, a partnership engaged in stock brokerage and investment counseling, the three corporations, engaged in managing investment portfolios and in buying and selling the corporate securities of publicly held corporations, Chasen, and Simon, all moved for dismissal on the ground that the complaints failed to state a cause of action under Florida law. Plaintiffs claimed that New York law should govern the rights and liabilities of the parties, and that even if Florida law were the applicable law they should still prevail. Holding that Florida law was the proper state law to apply, Judge Harold R. Tyler, Jr., by written order, sub nom. Gildenhorn v. Lum's, Inc., opinion reported at 335 F.Supp. 329 (SDNY 1971), granted the motion to dismiss for failure to state a claim upon which relief could be granted.
 
 
 2
 On this appeal plaintiffs claim only that Judge Tyler erred in dismissing the complaints for failure to state a cause of action.[2] They do not appeal Judge Tyler's order dismissing Chasen as a defendant or his finding that the substantive law of Florida governs the action.[3] Inasmuch as the court is passing only upon the sufficiency of the complaints, we necessarily accept the allegations of the complaints as true. For reasons which follow, we hold that the complaints do state a cause of action and we reverse the judgment below and remand to the district court for further proceedings there in the light of this holding.
 
 
 3
 The facts alleged in this case fall within the perimeter of the much-discussed problem of unfair trading in corporate securities. In November of 1969 Chasen, who was president and chief operating officer at Lum's, addressed a seminar of about sixty members of the securities industry with reference to Lum's earnings prospects for its fiscal year ending July 31, 1970. He informed them that Lum's earnings would be approximately $1.00 to $1.10 per share. On January 5, 1970 he learned that this estimate was too optimistic and that, in fact, Lum's earnings would be only approximately $.76 per share. Three days later, prior to announcing the information to the public, Chasen telephoned Simon in Chicago and told Simon that Lum's would not have as profitable a year as had been expected. He specified to Simon that earnings would be approximately $.76 per share rather than the $1.00 per share which he had earlier announced. Simon knew the information was confidential corporate property which Chasen had not given out publicly. Simon immediately telephoned this information to Sit, an employee of defendant Investors Diversified Services, Inc. (IDS),[4] and Sit immediately telephoned it to Jundt, another employee of IDS. Sit and Jundt managed the stock protfolios of defendant mutual funds Investors Variable Payment Fund, Inc. (Investors) and IDS New Dimensions Fund, Inc. (Dimensions). Upon receiving the information Sit and Jundt directed the Funds to sell their entire stock holdings in Lum's and, on the morning of January 9, 1970, prior to any public announcement, Investors sold 43,000 shares of Lum's and Dimensions sold 40,000 shares. The sales were executed on the New York Stock Exchange at about 10:30 A.M. at a price of approximately $17.50 per share. At 1:30 P.M. on the same day, the New York Stock Exchange halted further trading in Lum's stock pending a company announcement. At 2:45 P.M. Lum's issued a release which appeared on the Dow Jones News Wire Service and announced that the corporation's projected earnings would be lower than had been anticipated. When trading in Lum's was resumed on Monday, January 12, 1970, volume was heavy and the stock closed at a price of $14.00 per share-$3.50 per share lower than the Funds had realized from the sales of their shares on the previous Friday.
 
 
 4
 The present defendants in this case are Lehman Brothers, Simon, and the two Mutual Funds. Chasen, Sit, and Jundt have been dismissed as defendants in that they have not been validly served under the New York State Long Arm Statute. Plaintiffs-appellants' theory of recovery is that the participants in this chain of wrongdoing are jointly and severally liable to the corporation under Florida law for misusing corporate information to their own advantage in violation of the duty they owed to Lum's, and that they must account to Lum's for the profits realized by the Mutual Funds. They do not allege in these complaints that defendants have violated any of the federal securities laws,[5] and they concede that the substantive law of Florida governs the rights and liabilities of the parties. They urge, however, that inasmuch as there are no Florida cases directly in point, the Florida court, if it were deciding the case, would look to other jurisdictions and would take a particular and special interest in the decision of Diamond v. Oreamuno, 29 A. D.2d 285, 287 N.Y.S.2d 300 (1st Dep't 1968), aff'd 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969), a case which plaintiffs contend supports the position they urge on this appeal.
 
 
 5
 The first question which our court must consider is whether we may look to the New York decision of Diamond, supra, as persuasive authority. Ideally, the federal court sitting in a diversity action applies the applicable state law as it has been enunciated by the highest court in the state. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Hausman v. Buckley, 299 F.2d 696 (2 Cir. 1962), cert. denied, 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286 (1962). However, in the absence of a clearly enunciated state rule, the federal court may turn to the law of other jurisdictions for assistance in determining how the state court would most likely decide the case if the state court were presented with the questions being litigated in the federal court. Baxter v. Lancer Industries, Inc., 213 F.Supp. 92 (EDNY 1963), app. denied, 324 F.2d 286 (2 Cir. 1963); Locke Manufacturing Companies v. United States, 237 F.Supp. 80 (D.Conn.1964). Our foray into the state law of Florida satisfies us that the Florida court has never faced the precise issues which are present in this action. Accordingly, it is both proper and practical for this court to turn for guidance to the body of law of other jurisdictions and particularly to that of New York where the resolution of the issues in the Diamond case, decided by the New York Court of Appeals, bears on the issues in the case before us. In doing so, our objective is to interpret Diamond as the Florida court would probably interpret it and to apply Diamond, as so interpreted, to the facts presented here.
 
 
 6
 Diamond v. Oreamuno, supra, was a stockholder's derivative action in which a shareholder of Management Assistance, Inc. (MAI) charged that two of the defendants-Oreamuno, chairman of the board of directors, and Gonzalez, its president and a member of the board, had used inside information acquired by them solely by virtue of their positions with MAI in order to reap large personal profits from the sale of MAI shares, and that these profits rightfully belonged to the corporation. Chief Judge Stanley Fuld, writing for a unanimous court, held that the two directors must account to the corporation for their profits for they had breached their duty to the corporation by using a corporate asset for their own personal advantage.
 
 
 7
 In this case we are asked to decide whether the Diamond holding should extend to reach third parties, who, though not officers or directors of the injured corporation, are involved with directors in a common enterprise to misuse confidential corporate information for their own enrichment. Although there is no allegation in the complaints that a prior explicit agreement existed between Chasen and the defendants, it is obvious that the sequence of events detailed in the pleadings, if proved, will substantiate the existence of a common enterprise pursuant to which Chasen was to pass material information to Simon, Simon was to pass it to the Mutual Funds, and the Funds were to capitalize on it by selling Lum's stock prior to the time the material information was announced to and was available to the public. Cf. American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939); Norfolk Monument Company v. Woodlawn Memorial Gardens, Inc., 394 U.S. 700, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969). Although defendants do not deny that they have been involved in a joint enterprise with Chasen to misuse corporate property, they argue that the doctrine of Diamond is not applicable here and that they cannot be held liable to Lum's because they are not Lum's fiduciaries and have not breached any duty which they owed to Lum's by cashing in on confidential information for their own advantage. Defendants Simon and Lehman Brothers make the further argument that it would be "unfair" to hold them responsible for the profits made by the Mutual Funds in that they (Simon and Lehman Brothers) did not profit personally inasmuch as neither of them traded in Lum's stock.
 
 
 8
 As a court of equity viewing the case as the Florida court would probably view it, we cannot agree that the "stretch" of Diamond does not reach the defendants in this case. We find nothing in the language of Diamond to suggest that co-venturers of the director who breaches his duty should not be subject to the same liabilities as those of the director himself for the misuse of corporate information.[6] Indeed, the general rule has always been that "one who knowingly participates in or joins in an enterprise whereby a violation of a fiduciary obligation is effected is liable jointly and severally with the recreant fiduciary." Oil & Gas Ventures-First 1958 Fund Ltd. v. Kung, 250 F.Supp. 744 (D.C.1966); see, e. g., Jackson v. Smith, 254 U.S. 586, 589, 41 S.Ct. 200, 65 L.Ed. 418 (1921); Sexton v. Sword S. S. Line Inc., 118 F.2d 708, 711 (2 Cir. 1941); Bankers Life and Casualty Co. v. Kirtley, 338 F.2d 1006, 1013 (8 Cir. 1964). If the Diamond court had intended to lay down an exception to this well-known general rule it could have done so in its opinion. Moreover, in the light of the corporate interest which the Diamond rule is designed to protect, it is immaterial to the preservation of that interest whether the director trades on his own account in the corporation's stock or whether he passes on the information to outsiders who then trade in the corporation's stock. In either event, so long as the director is involved, the prestige and good will of the corporation may be tarnished by the public revelation that the director has been involved in unethical conduct. Diamond, supra, 24 N.Y.2d at 499, 301 N.Y.S.2d 78, 248 N.E.2d 910; accord, S. E. C. v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1308 (2 Cir. 1971), cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558, reh. denied, 404 U.S. 1064, 92 S.Ct. 734, 30 L.Ed.2d 753 (1972). Accordingly, it would be selfdefeating to limit the reach of Diamond to directors and officers of the injured corporation who have so acted while permitting third-party co-venturers of theirs to escape liability to the corporation.
 
 
 9
 Diamond, the law of the jurisdiction in which the New York Stock Exchange is seated, has the prophylactic effect of providing a disincentive to insider trading. It is clear that this cleansing effect ought to reach third parties who, through a breach of a fiduciary relationship, become traders advantageously possessed of confidential insider knowledge. To immunize such third parties from liability to the damaged corporation would encourage insider "leaks" to outside friends and would defeat Diamond's purpose and effect. And, quite properly, damages for fiduciary breaches are recoverable by recourse to state law. Indeed, though the congressional policy is similar, in some cases where federal private and governmental Rule 10b-5 actions are impractical, "immunized outsiders" might escape liability altogether except for the availability of this kind of action bottomed upon the well-recognized liability of a fiduciary to those whose trust in the fiduciary has been tragically misplaced. In view of the strong desirability of tightening the law of insider trading, we would be remiss indeed if we interpreted Diamond as narrowly as defendants would have us interpret it. Moreover, sitting as a court of equity, we have here an obligation to determine where the equities lie among all the litigants, Diamond, supra, 24 N.Y.2d at 498, 301 N.Y.S.2d 78, 248 N.E.2d 910, and, as between the defendants and Lum's, there can be no doubt that it would be inequitable to permit the defendants to keep the rewards of the fraud.[7]
 
 
 10
 Our view that all the participants in the common enterprise must assume the same risks of liability to the corporation as the offending director is supported by Florida case law dealing with the duty of a fiduciary to his cestui. The Florida courts have held that the duty of a fiduciary not to misuse the property of his cestui extends not only to the "technical fiduciary" but also to others who are placed in a position of trust. Quinn v. Phipps, 93 Fla. 805, 113 So. 419 (1927). The confidential relationship of a fiduciary as that relationship is spelled out in Florida law extends not only to "technical fiduciaries" but also to others who become "fiduciaries" through the acquisition of confidential information which is "owned" by someone else. See Quinn v. Phipps, supra at 420-421. When the defendants received their "tip" from Chasen, they were automatically clothed with a duty to Lum's not to use the information for their own selfish advantages. Compare Brophy v. Cities Service Co., 31 Del.Ch. 241, 70 A.2d 5 (1949); Ohio Oil Co. v. Sharp, 135 F.2d 303 (10 Cir. 1943). This is firmly grounded in law and the rule is set forth in the American Law Institute's Restatement of Agency 2d Sec. 312 (1958): "A person who, without being privileged to do so, intentionally causes or assists an agent to violate a duty to his principal is subject to liability to the principal." And see Comment c to Sec. 312:
 
 
 11
 A person who, with notice that an agent is thereby violating his duty to his principal, receives confidential information from the agent, may be enjoined from disclosing it and required to hold profits received by its use as a constructive trustee. * * *
 
 
 12
 Therefore, if plaintiffs can prove their allegations, it would seem that liability of the Mutual Funds to Lum's must necessarily follow. Be that as it may be, however, the defendants Lehman Brothers and Simon contend that it would be inequitable to apply the rule to them because they did not personally profit by trading in Lum's stock and they hold no profits as constructive trustees of that corporation. Nevertheless, Lehman Brothers and Simon obviously misused inside information as much as Diversified and Investors misused it, and therefore we fail to see how equity would be furthered by imposing liability only on the Funds and not on the other participants who supplied the Funds with the inside information. It is well established that the liabilities of persons engaged in a joint enterprise to commit a wrong are both joint and several liabilities and each participant is liable to account for the profits of the other participants. Marcus v. Otis, 168 F.2d 649 (2 Cir. 1948), modified, 169 F. 2d 148 (2 Cir. 1948); Solomon v. United States, 276 F.2d 669 (6 Cir. 1960), cert. denied, 364 U.S. 890, 81 S.Ct. 219, 5 L. Ed.2d 186 (1960), reh. denied, 364 U.S. 939, 81 S.Ct. 376, 5 L.Ed.2d 371 (1961). Accordingly, we hold that it would be proper to hold Lehman Brothers and Simon just as accountable for the profits made by their tippees Diversified and Investors as the tippees themselves.[8]
 
 
 13
 Defendants also contend that the complaints are presently insufficient because they fail to allege with sufficient particularity the damage Lum's is claimed to have suffered. This contention is without merit. Although the Gregorio complaint fails to allege any damages to Lum's, the Schein complaint contains a general allegation of damages, and we find nothing in Florida law to require anything more than a general ad damnum allegation.[9]
 
 
 14
 Defendants also urge that inasmuch as there are private Rule 10b-5 class actions for damages, e. g., Sanders v. Lum's, Inc., et al., 70 Civ. 5331 (SDNY) and an administrative suit brought by the Securities and Exchange Commission, SEC v. Lum's, et al., 70 Civ. 5280 (SDNY), pending in federal district court, defendants might be subjected to multiple liability if they are forced to remit to Lum's the profits the Mutual Funds made on their January 9 sales. Since appellees are fully aware of these federal court actions they are well able to protect themselves from multiple liability.[10]
 
 
 15
 Preventing those who are privy to confidential inside information from using it to their own advantage has found expression in numerous cases in the federal courts dealing with violations of the federal securities laws. See Securities and Exchange Commission v. Texas Gulf Sulphur, 401 F.2d 833 (2 Cir. 1968), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); List v. Fashion Park, Inc., 340 F.2d 457 (2 Cir. 1965), cert denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); Wohl v. Blair & Co., 50 F.R.D. 89 (SDNY 1970); Ross v. Licht, 263 F.Supp. 395 (SDNY 1967); Speed v. Transamerica Corp., 99 F.Supp. 808, 828-829 (D.Del.1951), aff'd, 235 F.2d 369 (3 Cir. 1956).
 
 
 16
 Accordingly, as to those persons found to be within the jurisdiction of the court, we reverse the order appealed from and remand the case for such further proceedings below as may be consistent with the contents of this opinion.
 
 IRVING R. KAUFMAN, Circuit Judge (dissenting):
 
 17
 In my view, it is no longer debatable that trading on inside information merits universal condemnation.[1] The undesirable nature of "insider trading" is reflected in the prophylactic provisions of Section 16(b) of the Securities Exchange Act of 1934 and the more general antifraud principles of Section 10(b) of that Act. I fully agree with Judges Waterman and Smith that one with access to material inside information concerning a corporation's affairs who knowingly purchases or sells that corporation's shares before this information has become publicly available takes unfair advantage of unknowledgeable parties to the transaction. Indeed, the factual claims contained in the complaints before us have led to two federal actions -an SEC injunctive action and a private class action under rule 10b-5-now pending in the District Court for the Southern District of New York. But the adage that hard facts make bad law is about to come true here, despite Judge, later Justice, Cardozo's warning that judges are not free agents roaming at will to create law to fit the facts. See The Nature of the Judicial Process 141 (1921). In the absence of any viable precedent upon which to base the totally new concept of law espoused by my brothers, it is clear that they announce an extraordinary, expansive, and incorrect reading of New York law solely because of their urge to "provid[e] a disincentive to insider trading." I agree with their objective but I question the means employed.
 
 
 18
 The court holds today that a person with no relationship whatsoever-fiduciary or otherwise-to a corporation, who trades its shares on the basis of material inside information becomes, ipso facto, a fiduciary of the corporation whose shares he traded and, accordingly, may be required in a shareholders' derivative action-not a Section 10(b) or 16(b) action-to pay his profits to the corporation. With all due respect to my brothers, the tortured reasoning to which they are compelled to resort in reaching this conclusion represents a distortion of the law of agency and the law of fiduciary responsibility in which I am unable to join. Accordingly, I dissent.
 
 
 19
 Stripped of excess verbiage, the complaints in the two consolidated stockholders' derivative actions before us make the following allegations. In January, 1970, Melvin Chasen, president of Lum's, learned that an earnings estimate of between $1.00 and $1.10 per share previously released to the financial community was grossly inaccurate. A more realistic figure was $.76 per share. Chasen revealed this inforamtion on January 8, during a telephone conversation, to Benjamin Simon, an employee in Lehman Brothers Chicago office. Simon, in turn, disclosed the adverse news to Eugene Sit, portfolio manager of Investors Variable Payment Fund, Inc., who himself conveyed the information to James Jundt, portfolio manager of IDS New Dimensions Fund, Inc. Both Sit and Jundt are employees of Investors Diversified Services, Inc. (IDS), investment adviser to the two mutual funds. During the morning of Friday, January 9, prior to any public disclosure of the reduced earnings figure, the two mutual funds sold a total of 83,000 shares of Lum's stock on the New York Stock Exchange at a price of approximately $17.50 per share. Later that day, after the Exchange halted trading in Lum's shares, Lum's publicly announced the reduced earnings forecast. Trading did not resume until the following Monday, when the closing price fell to $14.00 per share.
 
 
 20
 It is important to note at the outset that the plaintiffs in these actions, shareholders of Lum's, do not claim to have suffered any damages themselves. Rather, these derivative suits are brought "on behalf of and for the benefit of Lum's." They seek to recover for Lum's treasury the windfall profit garnered by the IDS mutual funds, and assert that all defendants are jointly and severally liable for this amount. Thus, the proper method of analysis is not to focus on the unfairness of the mutual funds' profit at the expense of their purchasers-who have their own recourse for any wrongdoing-but on the strands of duty running to the corporation from the various individuals involved. The curx of the majority's holding is that the institutional defendants -Lehman Brothers, IDS, and the two mutual funds-and their employees-Simon, Sit, and Jundt-are within the sweep of fiduciary principles announced in Diamond v. Oreamuno, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969). But a careful examination of that case and the principles underlying it demonstrate that Diamond is wholly inapposite to this case.
 
 
 21
 In Diamond, the New York Court of Appeals dealt with a derivative action brought by a shareholder of Management Assistance, Inc. (MAI) against Oreamuno, chairman of the board of directors of the corporation, and Gonzalez, its president. The complaint charged that by virtue of their corporate positions, these officers knew that a supplier's price increase had caused MAI's earnings to decrease by more than 75% during a one month period. According to the allegations, the two officers sold over 50,000 MAI shares at a price of $28 per share prior to public disclosure of the adverse earnings figures, after which the price per share plummeted to $11. In reviewing the Appellate Division's refusal to order dismissal of the complaint against Oreamuno and Gonzalez, Chief Judge Fuld stated at the outset that "the question presented-one of first impression in this court-is whether officers and directors may be held accountable to their corporation for gains realized by them from transactions in the company's stock as a result of their use of material inside information," 24 N.Y.2d at 496, 301 N.Y.S.2d at 79, 248 N.E.2d at 911 (emphasis added). A careful reading of the Diamond opinion reveals that Oreamuno's and Gonzalez's liability in a stockholders' derivative action was grounded solely in their having breached a fiduciary duty owed by them to MAI as corporate officials.
 
 
 22
 The inapplicability of these principles to any of the appellees[2] is readily apparent. The complaints here are barren of any allegation that the appellees-or Sit or Jundt-occupied any position, such as officer, director, employee, or agent, which would create fiduciary obligations to Lum's. Compare Brophy v. Cities Service Co., 31 Del.Ch. 241, 70 A. 2d 5 (1949); Quinn v. Phipps, 93 Fla. 805, 113 So. 419 (1927). Liability in Diamond was predicated entirely on such a relationship, and in its absence, the Diamond rationale for liability ceases to exist.
 
 
 23
 In an effort to bridge this fatal gap, the majority, without any basis in law or fact, reasons that the appellees were involved in a "joint" or "common enterprise" with Chasen, president of Lum's "to misuse confidential corporate information for their own enrichment." By use of this interesting, but nevertheless fictional, theory, they seek to foist upon the appellees liability to Lum's for Chasen's improper behavior. But the facts alleged in the complaints are a far cry from the "conscious parallelism" cases, drawn from the antitrust field, cited as authority in the majority opinion; the facts simply do not comport with the concept of a joint enterprise, a term which implies the existence of a prior plan to carry out a mutually beneficial project. The complaints, read in the most favorable light to the plaintiffs, disclose nothing more than a seemingly unsolicited and haphazard revelation of certain information which was useful in making investment decisions. There are ample remedies under the federal securities laws to punish this conduct. But, I am unable to understand on what basis the majority transforms the appellees' spontaneous conduct into a nefarious, prearranged, and ongoing scheme so that "joint" or "common enterprise" principles can make them liable as fiduciaries of a corporation with which they have no relationship.
 
 
 24
 A primary authority upon which the majority relies, Sec. 312 of the American Law Institute's Restatement of Agency 2d, exposes the inappropriateness of holding the appellees liable to Lum's for their conduct. Section 312 provides that "A person who, without being privileged to do so, intentionally causes or assists an agent to violate a duty to his principal is subject to liability to the principal." Although Comment c to this section speaks generally of receipt of confidential information by a third person from a principal's agent, the central element of liability is the third party's active and intentional aiding in the agent's violation of a duty owed to his principal. In this case, Chasen's duty to Lum's was to not disclose confidential corporate information. Yet there is not a word in the complaint charging that the appellees actively solicited the disclosure or that they had concocted a prearranged scheme with Chasen.[3] We are dealing here with an isolated transaction.
 
 
 25
 In the absence of any coherent legal theory, I cannot join my brothers in approving the use of the shareholders' derivative action device merely because, as my brothers candidly admit, to do so possibly may have a deterrent effect on "insider trading." Although developments in federal securities law indicate an expanding scope of liability for tippee traders, see In re Investors Management Co., Securities and Exchange Commission Release No. 34-9267 (Jul. 29, 1971) (SEC sanctioning of institutional investors who sold a corporation's shares after the corporation's underwriter revealed adverse earnings results to them); cf. SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1308 (2d Cir. 1971), cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1972) (affirming district court order, in SEC injunctive suit, requiring a "tippor" to divest an amount equal to his tippees' profits), the impetus for developing this expanded federal law liability-whose exact nature and scope remain in a formative stage-is the need to maintain free and honest securities markets. This need appropriately is given great weight when we consider claims under the federal securities law. But it is inapposite in determining whether, under state common law, tippee trading is a breach of a fiduciary duty owed to the corporation whose shares are traded, and if so, whether such a breach is remediable through use of a shareholders' derivative action.
 
 
 26
 In these actions, where jurisdiction is grounded solely in diversity of citizenship, the parties and the majority agree that our duty is to apply the law of Florida. Yet because there are no pertinent Florida decisions, the majority focuses on a New York decision, Diamond v. Oreamuno, supra. Thus, liability is founded on the conclusion of two federal judges that the Florida Supreme Court, if the instant case was before it, would look to a New York decision and, in addition, would give an unprecedented expansive reading to that case.
 
 
 27
 Despite the manner in which the majority opinion convolutes the law and the facts in this case, a view that a tippee is cloaked with state law fiduciary obligations to the corporation whose shares he trades is an unknown and untenable legal concept. Neither Diamond-itself a significant alteration of the common law principles applicable to an officer's or director's trading in his corporation's shares[4]-nor the law of agency support such a holding. Nothing in the majority opinion tells us why or on what grounds a New York court would hold a tippee trader liable to the corporation for his profits under common law fiduciary principles, and the court exceeds its authority by substituting its own view of what state law ought to be, for what the state law actually is.
 
 
 28
 Moreover, since the outcome of this case turns, ultimately, upon Florida law, I fail to comprehend why my brothers refuse to utilize Florida's certified question statute, Fla.Stat.Ann. Sec. 25.031.[5] This enlightened law provides for certification to the Florida Supreme Court by a federal appellate court of an unresolved question of Florida law which is determinative of a case before it and on which there are no clear, controlling Florida Supreme Court precedents. The statute states that the court, by written opinion, then may answer the certified question. See Aldrich v. Aldrich, 375 U.S. 249, 84 S.Ct. 305, 11 L.Ed.2d 304 (1963); Green v. American Tobacco Co., 304 F.2d 70 (5th Cir. 1962). The uncertainty inherent in the majority's speculation over what the Florida courts would decide if faced with this novel question of tippee liability under state common law fiduciary principles in a stockholders' derivative action would be dispelled authoritatively and finally.
 
 
 29
 Accordingly, I respectfully dissent.
 
 
 
 [1]
 Plaintiffs-appellants have not appealed the order dismissing the actions against Chasen, Sit and Jundt. Simon filed a similar dismissal motion but the trial court did not decide it. Simon was dismissed as a defendant by the court's order dismissing the complaints against all defendants for failure to state a cause of action under 12(b)(6) of the Fed.R.Civ.P. Simon contends on this appeal that irrespective of our action on the lower court's dismissal of the complaints under 12(b)(6), we should dismiss the action against him because he has not been validly served. However, inasmuch as the trial court has not reached this question, we decline to address it on this appeal, and leave its resolution to the trial court upon remand
 
 
 [2]
 In one of the original actions consolidated below, Gildenhorn v. Lum's, Inc., 335 F. Supp. 329 (SDNY 1971) a notice of appeal was filed by plaintiff but the parties have not progressed the appeal
 
 
 [3]
 The parties now agree that the substantive law of the State of Florida governs the action for reasons which are stated in Judge Tyler's opinion reported at 335 F.Supp. 329 (SDNY 1971)
 
 
 [4]
 Defendant IDS is a Minnesota corporation licensed to do business in the State of New York. IDS is the distributor and investment advisor for a number of large mutual funds including defendants Investors and Dimensions. Sit and Jundt are employed by IDS to manage the stock portfolios of Investors and Dimensions
 
 
 [5]
 Lum's could apparently not prevail as a plaintiff in a Rule 10b-5 action in that it has not traded in its securities on its own account. See Birnbaum v. Newport Steel Corporation, 193 F.2d 461 (2 Cir. 1952), cert. denied, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). Although there are federal securities law cases pending against defendants in district court, this fact is irrelevant upon this appeal
 
 
 [6]
 We believe Judge Tyler erred in attaching dispositive significance to the fact that in Diamond, supra, the complaint was dismissed against certain directors who had only "acquiesced" in the wrong. The defendants-appellees here differ from the dismissed Diamond defendants in that the defendants-appellees were actively engaged in furthering the transaction that resulted in the "dumping" of the Lum's stock, rather than just "acquiescing" in it. Furthermore, and even more importantly, Diamond was not a "joint venture" case, and there is no discussion in the Diamond opinion as to why the complaint was dismissed against the "acquiescing" directors
 
 
 [7]
 This principle has been applied in analogous cases involving violations of the federal securities laws. In more than one instance, the corporation whose stock has been illegally traded has been permitted to recover conditionally in a Rule 10b-5 action because it is more equitable for it to recoup the rewards of the fraud than for the insider who profits by misusing corporate information to keep them. See Securities and Exchange Commission v. Texas Gulf Sulphur, 446 F.2d at 1308; S.E.C. v. Golconda Mining Company, 327 F.Supp. 257 (SDNY 1971)
 
 
 [8]
 In passing we note decisions dealing with violations of the federal securities laws which involve the imposition of liability on defendants who have occupied statuses similar to the statuses occupied by defendants in this case. Thus, in Securities and Exchange Commission v. Texas Gulf Sulphur, 446 F.2d at 1308, the same argument raised by Simon and by Lehman Brothers was raised by defendant Darke. This court held that Darke was liable as a tippor for the profits realized by his tippees. Furthermore, "tippee liability," which is analogous to the liability being imposed upon Diversified and Investors, has been established in federal cases involving violations of the securities laws. See Ross v. Licht, 263 F.Supp. 395 (SDNY 1967); In the Matter of Cady, Roberts & Co., 40 S.E.C. 907 (1961)
 
 
 [9]
 We find it unnecessary to decide whether the defendants could prevail if neither complaint alleged damages to Lum's. We point out, however, that Florida law is not clear on the question and Diamond holds specifically that an allegation of damages is not a prerequisite to a recovery. Diamond v. Oreamuno, supra, 24 N.Y.2d at 499, 301 N.Y.S.2d 78. The case cited by defendants for the proposition that damages must be alleged (Palma v. Zerbey, 189 So.2d 510 (Fla.App.1966), cert. denied, 200 So.2d 814 (Fla.1967)) is a one paragraph per curiam opinion of a lower Florida court, the Florida District Court of Appeals which, inasmuch as it fails to provide a discussion of the issues, we find to be totally unpersuasive
 
 
 [10]
 See, for example, the method employed in Securities and Exchange Commission v. Texas Gulf Sulphur Co., 312 F.Supp. 77, 93 (SDNY 1970), aff'd in part, rev'd in part, 446 F.2d 1301 (2 Cir. 1971), cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L. Ed.2d 558 (1971), reh. denied, 404 U.S. 1064, 92 S.Ct. 734, 30 L.Ed.2d 753 (1971)
 
 
 [1]
 But for a contrary view, see H. Manne, Insider Trading and the Stock Market (1966)
 
 
 [2]
 As noted in the majority opinion, the only defendants remaining on appeal are Lehman Brothers, IDS, the two mutual funds, and Simon. The district court dismissed the actions against Chasen for lack of personal jurisdiction, a holding not challenged on appeal. Accordingly, this court need not comment on the nature and extent of Chasen's liability to Lum's because of his conduct
 
 
 [3]
 It is of no small significance that in the Diamond litigation, the Appellate Division affirmed dismissal of the complaint against other MAI directors-fiduciaries to the corporation-who allegedly "approved, acquiesced in or ratified" Oreamuno's and Gonzalez's transactions. 29 A.D.2d 285, 287 N.Y.S.2d 300 (1968). Despite the majority's effort in a footnote to "distinguish" this disposition, I believe the Appellate Division's action is clearly dispositive of the point before us. If the New York courts would not impose liability upon a director-a fiduciary of the corporation-who took no affirmative steps to cause or assist in a breach of a fiduciary duty by the corporation's president, I fail to see by what logic it can be urged that New York courts would hold liable a non-fiduciary who did not cause or assist in the breach
 
 
 [4]
 See Note, 1970 Wis.L.Rev. 576, 577. Although not dispositive, this fact augurs against assuming the state courts could make the broad holding so readily attributed to them by the majority
 
 
 [5]
 The supreme court of this state may, by rule of court, provide that, when it shall appear to the supreme court of the United States, to any circuit court of appeals of the United States, or to the court of appeals of the District of Columbia, that there are involved in any proceeding before it questions or propositions of the laws of this state, which are determinative of the said cause, and there are no clear controlling precedents in the decisions of the supreme court of this state, such federal appellate court may certify such questions or propositions of the laws of this state to the supreme court of this state for instructions concerning such questions or propositions of state law, which certificate the supreme court of this state, by written opinion, may answer
 This statutory authority has been implemented by Appellate Rule 4.61, 32 F.S.A.