**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,**

v.

**MONARCH FUND, Aspen Fund II and Bruce B. Paul, Defendants-Appellants.**

No. 1179, Docket 79–6048.

United States Court of Appeals, Second Circuit.

Argued June 13, 1979.

Decided Oct. 23, 1979.

Otto G. Obermaier, New York City (Martin L. Perschetz, of counsel, Washington, D. C.), for defendants-appellants.

David Ferber, Sol. to the Commission, Washington, D. C. (Rosalind C. Cohen, Sp. Counsel, Bruce Rinaldi, Atty., Securities and Exchange Commission, Washington, D. C., of counsel), for plaintiff-appellee.

Before VAN GRAAFEILAND and NEWMAN,* Circuit Judges, and BONSAL, District Judge.**

BONSAL, District Judge:

Defendants Monarch Fund ("Monarch"), Aspen Fund II ("Aspen"), both family investment partnerships, and Bruce B. Paul ("Paul"), manager of the partnerships, appeal from the decision of the District Court for the Southern District of New York holding that defendants violated Section 10(b) of the 1934 Securities Exchange Act ("1934 Act"), as amended, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.-10b–5.

On September 13, 1973, the Securities and Exchange Commission ("SEC") instituted this action against defendants alleging violations of Section 10(b) and Rule 10b–5 on the ground that defendants had traded in the stock of Bio-Medical Sciences, Inc. ("Bio-Medical") on the basis of material inside information that had not been disclosed to the public. The trial was held in May, 1978, and on November 28, 1978 by Memorandum decision, the district court held that defendants had violated Section 10(b) and Rule 10b–5 and granted plaintiff SEC injunctive relief and disgorgement of defendants' profits. This appeal followed. We reverse.

### Facts

In 1970, Bio-Medical was in its early stages of development. Its business consisted of developing, manufacturing, and marketing certain medical and other instruments and devices. It had not yet engaged in the manufacture of these products, but had been engaged in development and testing the products, which included a disposable clinical thermometer.

By the end of 1970, it became clear to the management of Bio-Medical that it would need additional financing. In January, 1971, Bio-Medical's Board of Directors decided to seek $5 million through a private placement of convertible debentures. Francis J. Clancey, a specialist in evaluating pharmaceutical companies, was retained as a finder to secure private institutional financing for Bio-Medical, with instructions to maintain the confidentiality of the proposed private placement. On April 13, 1971, arrangements were completed for the private placement of $5 million of debentures with a conversion price of $40 per share of common stock.[1] The closing was

---

* Honorable Jon O. Newman was United States District Judge for the District of Connecticut, sitting by designation, at the time of oral argument.

** Honorable Dudley B. Bonsal, United States District Judge for the Southern District of New York, sitting by designation.

1. In February, 1971, Delphi Management, Inc. had committed $1 million on behalf of one

held on April 28, 1971, and on that day Bio-Medical first announced the private placement to the public in the form of a press release. Reuters-Ultronics Report carried the announcement at 3:36 p. m. and the Dow Jones broad tape carried it at 3:44 p. m.

In 1971, defendant Paul was self-employed, managing investments for himself and his family. Aspen and Monarch were private investment partnerships that invested funds of the Paul family.

In 1969, Paul became interested in Bio-Medical at the time of its first public offering of securities. Beginning in early 1970 and continuing through August, 1972, Paul, on behalf of the family investment partnerships, purchased and sold a total of 16,300 shares of Bio-Medical common stock on the over-the-counter market.

In March, 1971, Paul heard from several sources that Bio-Medical might be seeking private financing. During February and March of that year, he discussed Bio-Medical with Frederick C. Waldron ("Waldron"), the president of F. C. Waldron & Co., Inc., an investment adviser company of which Paul was a major stockholder. In mid-March, Waldron informed Paul that he had heard that a placement of institutional financing for Bio-Medical was imminent in the form of a note convertible into common stock at $40–$50 per share, that insurance companies might be involved, and that he had heard the names Prudential and El Paso mentioned.

Paul sought to verify this information. He contacted Marvin Carton ("Carton"), vice-president of Allen & Company, which had participated in an earlier financing for Bio-Medical, who informed Paul that he had also heard that Bio-Medical was negotiating a $5 million financing with several major institutions including Prudential.

In March, 1971, Waldron introduced Paul to Burton Blank ("Blank"), a director of Bio-Medical and a partner in F.I. Salomon

client, El Paso Natural Gas ("El Paso"), and $200,000 on behalf of another, Great Lakes Steel Division, National Steel Corporation Pension Plan. In March, Prudential Insurance Co.

& Co., underwriter for Bio-Medical's 1969 public offering. At trial, Paul testified that he had questioned Blank on the financing of Bio-Medical and that Blank's "response was that the company is working on the financing and we expect it to be done shortly  . . . ." Appendix at 288.

In March and April of 1971, Paul traded in Bio-Medical stock on the over-the-counter market on behalf of the family investment partnerships, as follows:

|  | Number of Shares | Price | Date |
|---|---|---|---|
| Purchases | 500 | $51 | March 31, 1971 |
|  | 100 | $53½ | March 31, 1971 |
|  | 300 | $55 | March 31, 1971 |
|  | 400 | $64 | April 6, 1971 |
| Sales | 300 | $64 | April 15, 1971 |
|  | 400 | $69 | April 27, 1971 |
|  | 100 | $71 | April 28, 1971 |
|  | 400 | $70 | April 28, 1971 |

The average bid price of Bio-Medical fluctuated between 60 and 68 during the week prior to the press release of April 28, 1971. Following the press release, the price rose to 75, and on April 30 it began to decline.

In September, 1973, the SEC instituted this action against defendants seeking an injunction for violations of Section 10(b) and Rule 10b–5 and disgorgement of the profits allegedly made by defendants by reason of their trading on inside information in violation of Section 10(b) and Rule 10b–5. The trial was held in May, 1978, seven years after the defendants were alleged to have violated Section 10(b) and Rule 10b–5.

By Memorandum Decision dated November 28, 1978, the district court found:

"Paul deliberately set about obtaining information about Bio-Med and the possibility of a financing from inside sources. He succeeded in obtaining material, non-public information upon which he thereafter acted in purchasing Bio-Med stock to his profit. His conduct, therefore, violated Section 10(b) of the Exchange Act and Rule 10b–5 thereunder.  . . . He 'knew or had reason to know that the

of America ("Prudential") had committed itself to $3 million, and New York Life Insurance took the balance of $800,000 on April 13, 1971.

information was non-public and had been obtained improperly by selective revelation or otherwise' . . . ." *SEC v. F.L. Salomon & Co.*, No. 73 Civ. 3926, slip op. at 5.

Accordingly, the district court granted the SEC injunctive relief and directed disgorgement of the profits made by defendants in violation of Section 10(b) and Rule 10b–5.

On appeal, defendants-appellants argue that the district court erred when it granted injunctive relief more than seven years after the event. Specifically, they argue that the SEC failed to adduce adequate proof of a violation of Section 10(b) or Rule 10b–5, and that there was no proof and no district court finding of an intent to deceive, manipulate or defraud.

The SEC, on the other hand, argues (1) that the district court properly found that defendants violated Section 10(b) and Rule 10b–5 since the news of Bio-Medical's financing was material information that Paul knew or had reason to know was non-public; (2) that it was not required to prove scienter since scienter is not a necessary element of an SEC enforcement action under Section 10(b) and Rule 10b–5; and (3) that the remedial sanctions imposed by the district court were proper.

### The Law

Section 10(b) of the Securities Exchange Act of 1934 provides:

"Section 10. Manipulative and Deceptive Devices

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

. . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5, promulgated by the Securities and Exchange Commission pursuant to Section 10(b), provides:

"Rule 10b–5. Employment of Manipulative and Deceptive Devices

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

### Discussion

The district court found that Paul "knew, or had reason to know, that the information was non-public and had been obtained improperly by selective revelation." On the basis of these findings, the court held that Paul had traded in violation of Section 10(b) and Rule 10b–5. We disagree.

### I.

It is important at the outset to distinguish the roles played by various types of market traders. There are the insiders, who almost by definition have a degree of knowledge that makes them culpable if they trade on inside information. As officers, directors, or employees of a company, they are presumed to know when information is undisclosed. Because of their positions, insiders know when they have the kind of knowledge that is likely to affect the value of stock. *SEC v. Texas Gulf*

*Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith*, 495 F.2d 228, 236 (2d Cir. 1974).

We may not make the same assumptions with regard to outsiders, however, since the kinds of factual situations in which they acquire their information are innumerable.[2] For example, there is the tippee who knows or ought to know that he is trading on inside information, as against the outsider who has no reason to know he is trading on the basis of such knowledge. *See Schein v. Chasen*, 478 F.2d 817, 822 (2d Cir. 1973); *Investors Management Co.*, 44 S.E.C. 633, 641 (1971); *see also SEC v. Texas Gulf Sulphur Co.*, 401 F.2d at 852–53. Here, the record is silent as to whether Paul had reason to believe that either of his contacts—Waldron or Carton—had acted inappropriately. Indeed, if any inference may be drawn, it is the contrary one since neither Waldron nor Carton, when they discussed the possible refinancing with Paul, indicated that there was anything confidential about the information. While the one clear insider, Blank, initially parried Paul's effort to confirm the rumors about a prospective private placement, the entire colloquy between them is insufficient to establish that confidential information was being disclosed.

In addition, some outsiders, because of a special relationship with an issuing corporation, are privy to its internal affairs, whereas other outsiders have no ready access to the inner workings of a company. *See, e. g., Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 796 (2d Cir. 1969) (person acquiring information in course of negotiations with company), *cert. denied*, 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970); *Van Alstyne, Noel & Co.*, 43 S.E.C. 1080, 1081–86 (1969) (underwriters). It is not evident from the record, and plaintiff does not

claim, that Paul had any special relationship with Bio-Medical.

■ Then there is the question whether the disclosed information is of a specific or general nature. This determination is important because it directly bears upon the level of risk taken by an investor. Certainly the ability of a court to find a violation of the securities laws diminishes in proportion to the extent that the disclosed information is so general that the recipient thereof is still "undertaking a substantial economic risk that his tempting target will prove to be a 'white elephant.'" *United States v. Chiarella*, 588 F.2d 1358, 1366–67 (2d Cir.), *cert. granted*, 441 U.S. 942, 99 S.Ct. 2158, 60 L.Ed.2d 1043 (1979). *See generally* 6 L. Loss, Securities Regulation 3563–64 (Supp.1969). Here the information disclosed to Paul, by any standard, lacked the basic elements of specificity. No revelation was made of any underlying facts concerning the contemplated financing. No specific terms were divulged. Nor were the lenders identified. Nor was the date of the financing indicated, but only that the company "expect[ed] it to be done shortly." Appendix at 288.

## II.

All reasonable investors seek to obtain as much information as they can before purchasing or selling a security. Investors will usually consult a broker, having confidence that such a professional keeps abreast of the market, including the information circulated regarding specific securities, and will rely upon the information given to them by their broker. Therefore, investment advisors seek to obtain as much information—including rumors—regarding a security as they can so that they may properly advise their clients.

Since Paul was the investment adviser for his family investment companies, it was

---

**2.** One commentator has observed that to adopt the same ironclad disclosure requirements for inside and outside traders would be unworkable. Insiders are readily identified and easily policed. Since it would be much more difficult to scrutinize the activities of all outsiders who do not regularly receive nonpublic information, enforcement would be both random and costly. Comment, *The Application of Rule 10b–5 to "Market Insiders,"* 92 Harv.L.Rev. 1538, 1548 (1979).

his duty to trade in securities that he thought had attractive investment potential. It was for this reason that he made inquiries in the investment community to get information that he thought would be helpful in determining the efficacy of investments to be made for the clients he represented. In his inquiries regarding Bio-Medical, Paul testified that no one had told him that the rumors circulating in the marketplace about Bio-Medical's financing constituted corporate inside information. Indeed, the evidence indicated that rumors of possible financing were circulating throughout the over-the-counter community.[3]

Carrying the district court holding to its logical conclusion would mean that all investors, brokers, and investment advisers who are attracted to a particular security on the over-the-counter market and seek to obtain further information about it act at their peril. Indeed, they would have the affirmative duty to verify whether or not their information could be deemed public information, and failure to do so could subject them to civil and, possibly, criminal proceedings.

■ We need not today define in greater detail the line of demarcation between permissible and impermissible trading by outsiders. It suffices to hold that, on the record before us,[4] based upon the considerations that we have set forth, it was error for the court below to have found a violation of Section 10(b).[5]

### III.

■ The district court permanently enjoined defendants from any further violation of Section 10(b) and Rule 10b–5 "in connection with the purchase or sale of the securities of Bio-Medical, its subsidiaries or affiliates, or any security." Section 21(d) of the Securities Exchange Act of 1934 authorizes the SEC to bring action enjoining "any person . . . engaged or . . . about to engage in acts or practices constituting a violation . . . ." 15 U.S.C. § 78u(d). Where, as here, the SEC is not attempting to stop an ongoing violation of the securities laws, the test for injunctive relief is "whether the defendant's past conduct indicates . . . that there is a reasonable likelihood of further violation in the future." *See SEC v. Commonwealth Chemical Securities,* 574 F.2d 90, 99 (2d Cir. 1978), *quoting* 3 L. Loss, Securities Regulation 1976 (1961). As we further stated in *Commonwealth Chemical,* "[o]ur recent decisions have emphasized, perhaps more than the older ones, the need for the SEC to go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." 574 F.2d at 100.

■ Here, even if a violation of Section 10(b) and Rule 10b–5 had been shown—and it was not—we do not believe that an injunction was appropriate. The judgment below was not entered until more than seven years after the alleged violations. At oral argument, the SEC conceded that at no time during those seven years did it attempt to expedite the requested injunctive relief. Nor was there any evidence that the defendants committed any prior or subsequent violations of the securities laws. Indeed, Paul testified that since the action was commenced, he had exercised greater care with respect to information he received. For substantially the same reasons, we do not believe that disgorgement was properly authorized.

---

**3.** If the information relied upon is in fact widely known among investors, the usual informational inequities simply do not exist.

**4.** Included in that record is the fact that of the 1,300 shares Paul is accused of purchasing in violation of Rule 10b–5, all but 100 were sold *prior* to the official announcement of the private placement. Thus, virtually all his gain, if attributable at all to the likelihood of the private placement, could not have been the result of market reaction to the official announcement.

**5.** Our conclusion concerning the failure of proof of violation makes it unnecessary to give further consideration to the element of scienter in an SEC enforcement action, *see SEC v. Aaron,* 605 F.2d 612 (2d Cir. 1979), *cert. granted,* —— U.S. ——, 100 S.Ct. 227, 62 L.Ed.2d 168 (1979).

For the foregoing reasons, we reverse the decision of the district court and dismiss the complaint.