103 So.2d 615 (1958)
FLIGHT EQUIPMENT & ENGINEERING CORPORATION, a Florida corporation, Appellant,
v.
Ralph V. SHELTON, Appellee.
Supreme Court of Florida.
June 13, 1958.
*617 Dixon, DeJarnette, Bradford & Williams and James A. Dixon, Jr., Miami, for appellant.
Arthur A. Carlson and Ralph F. Miles, Hialeah, for appellee.
O'CONNELL, Justice.
Appellant, Flight Equipment & Engineering Corporation, was defendant and counterclaimant in the court below. Appellee, Ralph V. Shelton, was plaintiff and counterdefendant. Flight Equipment & Engineering *618 Corporation will be referred to in this opinion as defendant and Ralph Shelton will be referred to as plaintiff.
Plaintiff served the defendant in an executive capacity from September 2, 1950 until his resignation on July 16, 1953. Subsequent to his resignation he filed a complaint in the court below against the defendant claiming certain sums of money to be due him for salary, expenses and benefits accruing to him during his term of office. Defendant filed a counterclaim seeking recovery from plaintiff of various sums of money as enumerated and discussed subsequently.
The parties waived trial by jury. The lower court, after hearing the testimony and considering the exhibits, awarded plaintiff a judgment in the amount of $1,142.50 and allowed the defendant as a set-off upon its counterclaim the sum of $351.44, an amount representing the cost of certain airplane tickets paid for by the defendant and used by the plaintiff. The defendant thereupon instituted this appeal, asserting that the court erred in denying recovery for the sums requested in its counterclaim.
The following facts will be helpful to the reader in understanding this case.
The defendant corporation was organized in 1947 with the object of manufacturing aircraft seats. In 1949 additional capital was needed for expansion. To meet this need a large loan was obtained from C.N. Shelton & Co., a partnership composed of C.N. Shelton, brother of plaintiff, and five Chinese residents of Shanghai, China. C.N. Shelton had a power of attorney to act for his Chinese partners. C.N. Shelton & Co. is hereinafter referred to as the partnership.
On December 9, 1950 the loan from the partnership to the defendant was satisfied in exchange for 52% of the capital stock of the defendant corporation. By October 11, 1951 the partnership had acquired all of such stock.
Shortly before the partnership became the owner of 52% of the stock of the defendant, the plaintiff, on September 2, 1950, was hired as Vice President of the defendant corporation. On this date the partnership owned no stock in the defendant corporation. C.N. Shelton, brother of the plaintiff, then owned 50% of the capital stock of the defendant corporation. Plaintiff owned no interest in either the corporation or the partnership. On December 11, 1950 plaintiff became the Assistant Executive Vice President and General Manager of the defendant corporation.
On August 22, 1951 plaintiff was elected President of the defendant corporation and held such office until he resigned therefrom on July 16, 1953.
On or before May 20, 1953, L.K. K'ung became the sole stockholder of the defendant by purchase from the partnership.
On May 27, 1953, creditors of the defendant with claims totalling approximately $5,000 filed a petition in the Federal District Court seeking to have the defendant declared bankrupt and to have a receiver appointed. A hearing on this petition was set for June 2. On May 29th the plaintiff, as President of the defendant corporation, voluntarily consented to the appointment of a receiver.
On July 16, 1953 the plaintiff, on request of the sole stockholder, resigned.
On July 28, 1953 the Federal District Court found that the defendant corporation was not bankrupt, discharged the receiver and dismissed the bankruptcy proceedings.
On August 25, 1953 plaintiff filed this suit.
The defendant does not appeal from that part of the final judgment which awarded the sum of $1,142.50 to the plaintiff on his complaint, but only appeals from the denial to defendant of monies claimed under its counterclaim. We will therefore concern ourselves only with the counterclaim.
In its counterclaim the defendant sought recovery from plaintiff of various monies *619 which plaintiff without authority had caused to be paid either to himself or his wife or to others for his benefit. These claims are easily divided into six different items.
One of these was the claim that plaintiff, after his resignation as President of defendant corporation, had charged airplane tickets to the defendant. During the course of the proceedings in the trial court the parties stipulated as to the amount involved and in the final judgment the trial judge found the stipulated amount, $351.44, to be due to defendant from the plaintiff. We are not therefore concerned with this item in this opinion.
The next item, which we will refer to as item No. 1, concerns a bonus or bonuses paid to plaintiff. At plaintiff's direction checks of defendant totalling $10,000 were issued, some to plaintiff and some to his wife. These checks were issued between the dates September 25, 1951 and October 19, 1951. In addition plaintiff caused the defendant corporation to cancel debts owed by him to it in amount of $2,986.01, making a total of $12,986.01 charged to plaintiff as bonus. The plaintiff admits receipt of these sums, or the benefit thereof.
The minute book containing the minutes of the various meetings of the stockholders and board of directors of the defendant corporation show that at a special meeting of the directors held on September 2, 1950 the plaintiff was elected as Vice President and Director of the corporation, his salary as Vice President being set at $7,200.00 "per annum."
The minutes further reflect that at a stockholders' meeting held on December 11, 1950, the by-laws of the corporation were amended so as to abolish the office of Vice President and create the offices of Executive Vice President and General Manager, and Assistant Vice President and General Manager. The first of these new offices was given the power to employ, discharge and fix the compensation of all agents and employees of the corporation "other than the duly appointed officers." At a meeting of the Directors held on the same date C.N. Shelton was elected to the post of Executive Vice President and General Manager and Ralph V. Shelton as Assistant Vice President and General Manager.
At a meeting of the Directors held on January 2, 1951 the Directors voted that the salary of the President and Executive Vice President be increased to $200 "per week" provided that the auditor's report and other data available at the time of the increase justified such being done, the increase to be authorized at such time as R.V. Shelton might direct.
At the annual meeting of the Board of Directors held on August 22, 1951 the Directors adopted a resolution which recited that prior to the association of plaintiff with the defendant on September 2, 1950 C.N. Shelton, purporting to represent a majority of the capital stock, had entered into a verbal agreement with plaintiff whereby plaintiff would receive a salary of $1,100 per month plus a bonus of 25% of the corporate profits, before taxes, such salary and bonus to be paid when the corporation was financially able to do so. The resolution set plaintiff's salary at $1,100 per month, retroactive to July 1, 1951, and granted him the above-mentioned bonus, same to be awarded quarterly. However, the payments of the aforementioned salary and bonus were "expressly made subject to the prior approval of the Wage Stabilization Board or such other governmental board or organization as shall be interested provided, however, that the said bonus may be paid on or about the due date if it be determined that the Government does not have jurisdiction."
At a special meeting of the Board of Directors held on February 7, 1952 C.N. Shelton, who presided at the meeting, announced that the Salary Stabilization Board had authorized an increase in salary to $1,500 per month for the plaintiff as President of the corporation. He suggested that the raise be made retroactive to July 1, 1951, *620 but that in view of the financial condition of the corporation that the plaintiff's salary be reduced to $1,100 per month, effective February 8, 1952. He further stated that plaintiff had drawn a bonus of $10,000 for the first quarter of the current fiscal year and recommended that the bonus be approved. A resolution incorporating these recommendations was adopted. In the minutes, which are typewritten, there is inserted in longhand writing a provision signed by plaintiff to the effect that the $10,000 bonus is accepted by him as consideration for foregoing all further claims for a bonus.
Contrary to the statements of C.N. Shelton made at and reflected in the minutes of the directors' meeting held on February 7, 1952, the evidence reveals that on September 7, 1951, a few days prior to the issuance of the first bonus check to himself, the plaintiff applied to the Miami Field Office of the Wage Stabilization Board for approval of the proposed bonus and increase in salary and on October 22, 1951 the Miami Field Office of the said board rejected the application for approval of bonus and increase in salary.
Thereafter the plaintiff engaged a Washington, D.C. attorney to present the matter of his application for approval of the bonus to the authorities in that City. However, the record is clear that no formal application was ever presented and no approval of the bonus or increase in salary was ever received.
Without detailing the history of the Wage Stabilization Board or the Salary Stabilization Board, it is sufficient to say that the first named board, on January 25, 1951, froze all wages and salaries as of that date. Thereafter, the Salary Stabilization Board was created on May 10, 1951, 16 Fed.Reg. p. 4356, and given jurisdiction over salaries of executive personnel such as plaintiff. By order dated July 5, 1951, 16 Fed.Reg. p. 6617, it froze all matters under its jurisdiction as of January 25, 1951. This "freeze" continued until February 6, 1953, 18 Fed.Reg. p. 809.
The effect of the above-mentioned regulations and orders freezing salaries was to prevent the payment to plaintiff of salaries or bonuses greater than he had been receiving at the effective date thereof, unless prior approval was obtained from the board administering such matters. Any payment of or agreement to pay salaries in excess of those permitted by the regulations was unlawful and therefore void. Mitchell v. Texas Housing Co., Tex. Civ.Ct.App. 1954, 265 S.W.2d 157. Also see Allen v. Grand Central Aircraft Co., 1954, 347 U.S. 535, 74 S.Ct. 745, 98 L.Ed. 933. The Allen case points out the similarity between the Stabilization Act of 1942, 50 U.S.C.A.Appendix, § 961 et seq., the board acting thereunder, and the regulations involving salaries and wages and the Defense Production Act of 1950, 50 U.S.C.A.Appendix, § 2061 et seq., the boards created thereunder and the regulations promulgated by them which control the matter now before us. For that reason the following cases are of interest: Wernhardt v. Koenig, D.C.E.D.Pa. 1945, 60 F. Supp. 709 (contract held unenforceable and void); Kells v. Boutross, 1945, 184 Misc. 206, 53 N.Y.S.2d 734 (any such contract is illegal, contrary to public policy and not enforceable, pointing out that violation of act is criminal offense); De La Rama S.S. Co., Inc. v. Pierson, 9 Cir., 1949, 174 F.2d 84; In re Pringle Engineering & Mfg. Co., 7 Cir., 1947, 164 F.2d 299; Morford v. Bellanca Aircraft Corp., 1949, 45 Del. 129, 67 A.2d 542.
Under these facts and the pertinent regulations it was unlawful for the defendant to pay and for the plaintiff to receive the bonus of $10,000. The defendant is entitled to have this sum returned to it by the plaintiff.
As above-stated, the plaintiff also caused debts due by him to defendant in amount of $2,986.01 to be cancelled on the books of accounts of the defendant. There is no authority expressed anywhere in the corporation's minute book for this action, assuming it could have been validly done *621 under the then existing federal salary and wage restrictions. Nor is the defendant shown to have ratified this action. In his testimony plaintiff stated that the cancellation of the said debts was credited to him as a bonus. The cancellation of this debt in form of a bonus was a nullity for the same reasons on which we found that the $10,000 payment was illegal, and for the further reason that there was no authority, express or implied, shown to have been given plaintiff by the corporation for the cancellation of said debt. Defendant is entitled to recover this sum of $2,986.01 from the plaintiff.
We have considered that the Board of Directors of the defendant corporation at its February 7, 1952 meeting did ratify the payment of the said sum of $10,000 as a bonus.
It cannot be disputed that a board of directors of a corporation is without power to ratify that which it cannot do directly or that which it could not authorize be done initially. It has no power to ratify a void or illegal act. Gentry-Futch Co. v. Gentry, 1925, 90 Fla. 595, 106 So. 473; Luria v. Bank of Coral Gables, 1932, 106 Fla. 175, 142 So. 901, 143 So. 598; 19 C.J.S. Corporations § 763.
The payment to himself by plaintiff of the sum of $10,000, claimed by him to be a bonus, being illegal under the then existing regulations could not be ratified by the defendant.
Accordingly, as to item No. 1, the defendant is entitled to recover the sum of $12,986.01 from the plaintiff.
The next claim of the defendant, referred to herein as item No. 2, is that plaintiff, without authority and wrongfully, caused defendant's funds to be used for payment of premiums on certain insurance policies issued on the life of plaintiff in a total amount of $7,827.50.
In connection with this item, it is to be noted that in his complaint plaintiff claimed that defendant, after plaintiff's resignation on July 16, 1953, had refused to assign to him two life insurance policies, each in amount of $25,000, which plaintiff alleged and the evidence shows to have had a total cash surrender value of approximately $1,900. The evidence shows these policies were cancelled by defendant, which received the cash value thereof.
The judgment entered on plaintiff's complaint was in the total sum of $1,142.50. While it is not shown in the judgment how the figure allowed was determined it is evident that the trial judge did not allow plaintiff the cash surrender value of these policies.
The sums which the plaintiff caused to be paid from defendant's funds for insurance are not in dispute, only plaintiff's authority to do so is in question.
The whole record before us is devoid of any evidence that the board of directors or the stockholders authorized the plaintiff to have the policies in question issued or to pay the premiums thereon from corporate funds. There are numerous references in the corporate minutes to compensation to be paid to the officers and to Ralph V. Shelton, specifically, yet there is no mention of this item of insurance, or the items of overtime, car allowance, or other expenses to be mentioned later.
Plaintiff does not contend that the defendant through its Directors ever authorized such payments for insurance. Rather he contends, first, that his brother, C.N. Shelton, representing the majority of the stockholders, had authorized him to purchase the first two policies, which policies are the two which plaintiff in his complaint contended should have been assigned to him on his resignation. These two policies were on the life of the plaintiff and named the defendant as beneficiary. The total of the premiums paid thereon from corporate funds was $5,326.50.
The record is bare of any evidence showing that either C.N. Shelton, assuming he *622 had the power to do so, or the directors authorized the issuance of or payment of premiums on the various other life and health and accident policies, which premiums plaintiff caused to be paid from the defendant's funds. The corporation was named as beneficiary in none of these policies. The total of the premiums paid on these latter policies was $2,501.
Secondly, plaintiff contends in effect that the defendant is estopped to claim that the payment of the premiums on any and all of the policies was wrongful because the payment thereof had been shown on the books of the corporation at all times and were shown on the yearly audits of the defendant's affairs, and the corporation had made no objection thereto until this suit was instituted. Further, plaintiff argues that carrying such insurance coverage is standard procedure employed by corporations to obtain high-caliber executive personnel and that the defendant had the advantage of deducting these premiums on its federal income tax returns.
We find no basis in the facts of this case for application of the doctrine of estoppel. The plaintiff, who at all times involved was not an employee but rather a part of the directorate of the corporation and was, by his own testimony, in complete control of the fiscal and management affairs of the corporation, and who directed the checks be drawn for payment of the premiums cannot claim the benefit of estoppel to cover his own unauthorized acts. Although the item of insurance expense was shown on the audits, it was not broken down so as to show that life or health and accident insurance premiums were being paid by the corporation. Nor does the fact, if it be true, that other corporations provide such insurance coverage or that the defendant utilized the premiums paid as a deductible expense for income tax purposes add righteousness to or cure the lack thereof in plaintiff's action in this regard.
However, we see a distinction in the payment of the premiums on the two policies in which the defendant was beneficiary and the others in which it was not. First, there was conflicting evidence as to the authority of plaintiff to have such policies written and to pay the premiums therefor from corporate funds; and secondly, the defendant was the beneficiary thereof. On the theory that C.N. Shelton, in authorizing the plaintiff to pay said premiums, represented the majority of the stockholders and that the policies were written for benefit of the corporation and in view of the fact that the facts on the question of authority were somewhat in conflict, we will sustain the trial court in its obvious ruling that the payment of the premiums in amount of $5,326.50 on the first two policies could not be recovered by the defendant; but as to the premiums on the remainder of the policies in amount of $2,501 we rule that the plaintiff wrongfully caused same to be paid and defendant is entitled to recover this sum from him.
The next item in the counterclaim, which we will refer to as item No. 3, concerns sums drawn from defendant by plaintiff for "overtime" pay.
Commencing on July 22, 1952 and continuing through the month of May 1953, the plaintiff caused to be paid to himself overtime pay for all hours allegedly worked by him in excess of 40 hours per week. The total of such overtime payments was $9,214.47, computed on the basis of approximately $10 per hour.
Plaintiff contends that he was entitled to payment for overtime under the provisions of a document entitled "Company Policies", which was issued by him for the defendant under date of July 1, 1952. The said document, which, among other things, defined employees as being either hourly rate employees or salaried employees, provided that:
"After an employee, whether salaried or hourly, has worked 40 hours, he will be entitled to overtime at 1 1/2 his basic hourly rate. However, no overtime will be worked or will be paid *623 unless prior approval has been gotten from the person authorized to approve overtime."
The plaintiff, as President of defendant corporation, was one of the persons who was to approve overtime.
The document stated that "salaried employees" were those being paid a fixed weekly wage for 40 hours work. It also provided that if such an employee worked less than 40 hours in a week he would be paid only for the hours he worked.
Plaintiff contends that, as President of the defendant corporation, he was a "salaried employee" entitled to overtime for hours worked in excess of 40 hours per week. Defendant contends he was an officer compensated on an annual or monthly basis.
The record shows that plaintiff drew his salary weekly, but this is unimportant. It is the nature of his position in relation to the corporation which determines whether he was an officer or an employee.
There are various distinctions between corporate officers and employees. For example, an officer holds an office and performs duties created and prescribed by charter or by-law, and the officer is elected either by action of the stockholders or the board of directors at a salary or for compensation fixed by them or by the charter or by-laws.
On the other hand an employee usually occupies no office; he is generally employed not by action of the stockholders or directors but by the managing officer of the corporation, who also determines the compensation to be paid.
The officers of a corporation occupy a quasi-fiduciary relation to the stockholders and the corporation while employees do not. Employees are usually subordinate to and act under control of corporate officers, while the officers exercise the power of management under the policies or directives of the board of directors.
Unless specified to the contrary by appropriate action, an officer is usually held to devote to performance of his duties such time and effort as is reasonably required. He is not required to work any specific number of hours. On the other hand an employee is usually required to work a specified schedule of hours.
There are other reasons, but the foregoing distinctions are sufficient to support our conclusion that the plaintiff was not a salaried employee of the defendant, but rather was an officer. Obviously he does not come within the definition of salaried employee in the "Company Policies."
This leads us to the basic reason which makes wrongful the overtime payments drawn by plaintiff.
It is a well settled rule that officers of a corporation are not entitled to recover, draw or retain compensation for their services unless authorized by the board of directors or by the stockholders. Many authorities hold that express provision must be made therefor in the corporate minutes. 19 C.J.S. Corporations § 803; 13 Am.Jur., Corporations, Sections 1027, 1035, and cases cited therein.
It is equally well settled that a corporate officer is without authority to fix or increase his own salary. See 19 C.J.S. Corporations § 805; 13 Am.Jur., Corporations, Sec. 1035; Fletcher Cyclopedia Corporations, Vol. 5, perm. ed., Sec. 2127; Thompson on Corporations, Vol. 3, Sec. 1860 (3rd ed. 1927) and the cases cited in these authorities. In this State we have in accordance with this principle held that directors cannot fix their own salaries, as officers, unless expressly authorized to do so by the charter or the stockholders. Redstone v. Redstone Lumber & Supply Co., 1931, 101 Fla. 226, 133 So. 882, 884.
The reason for the rule is so obvious as to require no explanation and the case at bar is good example of the wisdom and necessity for it. For if such were not the *624 rule there would be no limit to the possible invasion of the corporate treasury by the officers who have access thereto.
Corporate officers have ample opportunity, as did the plaintiff in this case, to have their salaries fixed or adjusted before they render their services and before they draw their salaries. It is not burdensome or unfair to require them to do so.
And where the compensation to be paid an officer is expressly set forth in a contract or in the corporate minutes he cannot recover or draw additional compensation, in the absence of additional authority for such. However, an officer may be entitled to additional compensation for services rendered the corporation, which services are extraordinary and not within the scope of his duties as such officer, where it is clearly shown that the services were of benefit to and accepted by the corporation and were rendered under such circumstances as to clearly imply an agreement to pay therefor on part of the corporation.
But in the case before us plaintiff does not contend that the overtime pay was drawn by him for extraordinary services. On cross-examination, when asked if his duties had changed or increased at the time he began drawing overtime pay, he replied:
"No. The reason for drawing overtime was that my salary had been reduced from $1,500.00 a month to $1,100.00 a month. I said under the circumstances of taking the reduction in salary at a time when the company was making a lot of money  through no fault of my own it had been withdrawn by one of the stockholders  I should not be penalized because of that act, that I would stay on as president only provided I draw overtime for my work."
Plaintiff did not explain to whom he made the above statement that he would continue as President only if he was paid overtime. There is no evidence of such a statement reflected in the corporate minutes of the meeting of February 7, 1952 at which his salary was raised from $1,100 to $1,500 per month retroactively, and then immediately reduced again to $1,100 per month. There is no evidence of assent or agreement to pay overtime to the plaintiff.
In this case it is clear that the plaintiff in effect raised his own salary by drawing overtime pay.
We find no basis for plaintiff's drawing overtime either under any express or implied agreement with the corporation or under the "Company Policies" above-mentioned. The defendant is for the reasons above expressed entitled to recover from the plaintiff the sum of $9,214.47 which the plaintiff caused to be paid to himself as overtime pay. This decision as to this item could be reached also on a basis of the fact that the evidence shows that the federal regulations regarding wages made the payment of overtime illegal if it were not being drawn at the effective date of the regulations. The plaintiff admits he was not drawing overtime on that date. Nor does the record support his contention that his predecessor executive officers had drawn overtime pay.
In item No. 4, the defendant contends that the plaintiff caused to be paid to himself as expenses the total sum of $31,169.45 but only accounted for $30,119.45, leaving a balance unaccounted for of $1,050. These figures are uncontradicted.
Further, the evidence reveals that plaintiff was given an automobile allowance which according to plaintiff was:
"Ten dollars a week * * * which was a flat $10.00 a week to be paid to me for expenses in operating an automobile, any automobile that I may operate."
However, in the total expenses drawn by plaintiff as above stated there was an item of $1,099.59 for rental of cars by plaintiff on his various travels about the country. Defendant contends the $10 allowance was *625 to cover all automobile expense of the plaintiff. In other portions of the testimony it seems clear that plaintiff contends that the $10 weekly allowance was to cover local use of an automobile as opposed to car rental by him when on business trips.
In his complaint in this cause plaintiff, among other things, sought payment from defendant of car allowance of 25 weeks at $10 per week. It is impossible for us to determine whether this sum was allowed plaintiff by the trial judge.
Where reasonable expenses are necessarily incurred by a corporate officer in performance of his corporate duties, and performance of such duties are of benefit to the corporation, the officer is legally entitled to be reimbursed therefor under the theory of implied contracts. On this basis and in view of the evidence in the record we believe the trial judge properly denied the defendant's recovery from plaintiff of the sums withdrawn as car rental expense.
However, as to the difference of $1,050 between the sums drawn as expenses and the sums accounted for, the existence of the unaccounted balance not being disputed, the defendant is entitled to recover that sum from the plaintiff.
A director or officer of a corporation is bound to account to the corporation for all monies and property which come into his hands by virtue of his official position, as well as for all sums of money or property which he has wrongfully accepted or withdrawn from the corporation. This moral and legal principle leads inevitably to requiring plaintiff to account fully for the sums withdrawn by him for expenses. Having failed to do so he must pay to defendant those sums for which he has failed to account.
The last item, item No. 5, is a claim by defendant for expenses charged against and paid by it as a result of the plaintiff's negligent, unauthorized and unlawful consent to the appointment of a receiver in bankruptcy proceedings in federal court. Defendant says these expenses were $12,432.99 and this is uncontradicted in the record.
Plaintiff's actions in consenting to a receiver are, based on the record before us, contrary to every principle applying to agents, fiduciaries and trustees. Unquestionably, at least, his relation to the defendant and the then sole stockholder, Mr. K'ung, was that of a quasi-fiduciary and his duties and his conduct must be measured in the light of that position.
The claims of the three creditors amounted only to approximately $5,000. However, plaintiff testified that the total accounts payable of the corporation were in excess of $60,000, and that if the petitioning creditors had not filed the petition in involuntary bankruptcy, others would have done so.
The petition was filed on May 27, 1953. A hearing to consider the appointment was set before the court for June 2, 1953. On May 29, 1953 the plaintiff, as President of the defendant corporation, voluntarily consented to the appointment of a receiver. After hearing, the receiver was discharged and the bankruptcy proceedings dismissed on July 28, 1953.
The following pertinent facts, uncontroverted in the record, were known to plaintiff or should have been known to him:
1. On or about May 21, 1953, defendant was advised that the paying officer of the Southern Air Procurement District, U.S.A.F., was authorized to pay to defendant the sum of $13,574.56, which sum was paid to defendant on June 1, 1953.
2. On May 27 or 28, 1953 defendant, through the person of plaintiff, was advised by a bank in New York that upon execution of a note the bank would honor a draft in amount of $7,568, which was done and the funds received by defendant and acknowledged by plaintiff on May 29, 1953.
3. On May 29, 1953 defendant shipped C.O.D. goods to a customer in value of $4,345.
*626 4. Plaintiff acknowledged that he knew that Mr. L.K. K'ung the then sole stockholder of the company, was coming to Miami within a few days with funds to pay creditors.
5. Plaintiff testified that the assets of defendant were in excess of $100,000 and that the accounts payable were only some $60,000.
6. Plaintiff testified that the defendant had an additional asset represented by a promissory note in amount of $27,000 in which Mr. K'ung was maker.
Plaintiff's explanation of his action in consenting to appointment of a receiver was that:
1. The defendant was insolvent since "it had no  not sufficient cash to meet its outstanding past due liabilities", although he acknowledged that the defendant's assets exceeded its liabilities.
2. Mr. K'ung had refused to pay the $27,000 note due the defendant. Plaintiff reasoned he would do so if the defendant went into bankruptcy.
3. Plaintiff's attorney advised him that his first duty was to the defendant's creditors, rather than to the corporation and its stockholders.
Plaintiff's explanation neither justifies nor excuses his action. The uncontroverted facts show that the assets of the defendant exceeded its liabilities, that plaintiff knew defendant, before the date set for hearing on the petition, would receive payment of accounts receivable and funds from the New York bank in excess of the claims of the petitioning creditors, and that plaintiff knew Mr. K'ung was coming to Miami in a few days with funds to pay off the creditors. Therefore, assuming plaintiff had the authority to consent to the appointment of a receiver, the facts did not warrant such action.
As explained by plaintiff, his motive in consenting to the appointment of the receiver was to coerce Mr. K'ung to pay the $27,000 note due the corporation. He attempts to justify this course on the theory that his first duty was to the creditors, not the corporation or its stockholder.
Plaintiff's concept of the relation and obligation of a corporate officer to the corporation and its stockholders is both strange and unfounded in law.
An officer or director occupies a quasi-fiduciary relation to the corporation and the existing stockholders. He is bound to act with fidelity and the utmost good faith. He is bound to be loyal to his trust. In accepting the office he impliedly agrees and undertakes to give the corporate enterprise the benefit of his best care and judgment and to exercise the powers conferred on him solely in the interest of the corporation and the stockholders. Tampa Waterworks v. Wood, 1929, 97 Fla. 493, 121 So. 789; Lemire v. Galloway, 1937, 130 Fla. 101, 177 So. 283; Orlando Orange Groves Co. v. Hale, 1932, 107 Fla. 304, 144 So. 674; Hayes v. Belleair Development Co., 1935, 120 Fla. 326, 162 So. 698; Skinner v. Hulsey, 1931, 103 Fla. 713, 138 So. 769; Chipola Valley Realty Co. v. Griffin, 1927, 94 Fla. 1151, 115 So. 541.
Measured by this standard the plaintiff's conduct is left wanting. The violation of his trust was due not to negligence, but to a deliberate act with full knowledge of the facts and the probable results.
Further, plaintiff does not contend that he was authorized to consent to the appointment of a receiver, either by the stockholders or the board of directors, nor does he contend that the authority to do so was implied within the powers of his office. Speaking mildly, it was an unauthorized act, not for the benefit of the corporation and stockholders but against their interest. A corporate officer has no implied or inherent authority to consent to the appointment of a receiver. Saxon v. Southwestern Brick & Tile Mfg. Co., 1904, 113 La. 637, 37 So. 540; Walters v. Anglo-American Mortgage & Trust Co., C.C.Neb. 1892, 50 F. *627 316; Bassett v. Bickford Bros. Co., D.C.W.D.N.Y. 1916, 232 F. 895; Bruch v. National Guarantee Credit Corp., 1922, 13 Del. Ch. 180, 116 A. 738.
It is obvious that plaintiff did not agree with certain actions of Mr. K'ung, the only stockholder. Plaintiff may well have been correct in his views. But his remedy was to present his objections to the board of directors and/or Mr. K'ung and if their decisions did not coincide with his he should either have joined their views or surrendered his office. So long as he continued to occupy his office of trust he was obligated to act in the interest of the corporation and Mr. K'ung not against them.
Officers and directors of a corporation are liable for damages to the corporation which result from a breach of their trust, a violation of authority or neglect of duty. This liability rests on the common-law rule that every agent is responsible to his principal for such acts which result in damage to the principal.
The plaintiff here had a clear duty to oppose the petitions in bankruptcy and the appointment of a receiver. He had the duty to present to the court the facts relating to the financial status of defendant which are recited in this opinion. He had the duty to avoid the expense entailed in the appointment of a receiver.
For the reasons above expressed the plaintiff should be held responsible for the expenses incurred by his unwarranted and unauthorized act of consenting to the appointment of the receiver. Defendant is entitled to recover the sum of $12,432.99 from the plaintiff for this item.
We have herein decided that the defendant, in addition to the sum allowed in the final judgment, is entitled to recover the following sums from the plaintiff:
1. $12,986.01 under item No. 1, for sums illegally paid plaintiff as a bonus and debts of plaintiff cancelled on the books of the defendant.
2. $2,501.00 under item No. 2, for insurance premiums wrongfully caused to be paid by plaintiff from defendant's funds.
3. $9,214.47 under item No. 3, for overtime payments wrongfully drawn by plaintiff.
4. $1,050.00 under item No. 4, for monies drawn by plaintiff for "expenses" not accounted for.
5. $12,432.99 under item No. 5, for expenses incurred and paid by defendant in the bankruptcy proceedings.
While the record supports the specific figures mentioned above and there seems to be little cause for any further proceedings to be had in the cause after the issuance of the mandate of this Court, nevertheless, the trial court is specifically authorized to conduct such further proceedings herein as it in its discretion deems wise and necessary and is authorized to adjust the sums which we have found defendant entitled to recover if we have made any arithmetical error in arriving at those sums.
We take pains to point out that on those matters in which we have reversed the trial court, for the most part if not in every instance, there was no conflict in the evidence, and our reversal is based upon what we consider to have been a misapprehension of the legal effect of uncontroverted evidence and upon matters of law.
We have observed the splendid and effective use of pre-trial procedure in this difficult case by the fine trial judge and the excellent manner in which counsel, with utmost candor, co-operated therein. We wish to commend the court and counsel for their efforts in making the most of this important tool in this case.
The pre-trial proceedings consumed almost two days, but as a result thereof the many exhibits were introduced into evidence subject only to relevancy and materiality without the long line of witnesses which otherwise would have been required to prove them. As a result the issues to be *628 tried were made crystal clear, trial by jury was waived, and the actual trial lasted only two days, producing a record considerably smaller than otherwise would have resulted. The net result was a saving in time and cost to all concerned, including the court.
For the reasons above expressed the judgment appealed from is reversed in part and affirmed in part, with leave to the trial judge to conduct further proceedings, not inconsistent herewith, if he deems such to be necessary.
TERRELL, C.J., and HOBSON, DREW and THORNAL, JJ., concur.