Jacob SCHEIN and Marvin H. Schein,
Plaintiffs-Appellants,

v.

Melvin CHASEN et al.,
Defendants-Appellees.

Antone F. GREGORIO,
Plaintiff-Appellant,

v.

LUM'S, INC., et al., De-
fendants-Appellees.

Nos. 81, 82, Dockets 72–1373, 72–1375.

United States Court of Appeals,
Second Circuit.

Submitted April 21, 1975.

Decided May 2, 1975.

Wolf, Popper, Ross, Wolf & Jones,
New York City (Donald N. Ruby, New
York City, of counsel), for plaintiffs-ap-
pellants.

Simpson, Thacher & Bartlett, New
York City (James J. Hagan, New York
City, of counsel), for defendants-appel-
lees.

Before KAUFMAN, Chief Judge, and
WATERMAN and SMITH, Circuit
Judges.

PER CURIAM:

This case returns to us after an ex-
traordinary journey. In Schein v. Cha-
sen, 478 F.2d 817 (2d Cir. 1973), we re-
versed the judgment of the trial court
dismissing plaintiffs' shareholder deriva-
tive suit. (Kaufman, C. J., dissenting).
The majority concluded, under Florida
law, that investors who sell stock on the
basis of inside information provided by a
stockbroker—who in turn received the
information from the president of the
issuer corporation—may be liable to the
corporation in a shareholder derivative
action. They also found that the stock-
broker who relayed the information
could be held liable. The Supreme Court
vacated our judgment, Lehman Brothers
v. Schein, 416 U.S. 386, 94 S.Ct. 1741, 40

L.Ed.2d 215 (1974) so that this court might consider certifying the controlling issues of Florida law to the Supreme Court of Florida for determination.

Pursuant to that direction, we issued the following certificate to the Supreme Court of Florida, *see* § 25.031, Florida Statutes, and Florida Appellate Rule 4.61:

Statement of Facts:

 A complete discussion of the facts as alleged in the two complaints can be found in the opinion of this Court [478 F.2d 817 (2d Cir. 1973)].

Questions to be certified:

1. Are investors, who sell stock on the basis of inside information about the issuer corporation which they received from a stockbroker who in turn received the information from the president of the issuer corporation, liable to the corporation in a shareholder derivative suit under Florida law for the profits realized by the investors on the sale of that stock?

2. Is the stockbroker, who relayed the material information from the president of the issuing corporation to the investors, jointly and severally liable with them for the profits realized on the sale in a shareholder's derivative suit under Florida law?

The Florida Supreme Court, in a decision appended to this opinion, answered the questions certified as follows:

. . . [W]e find that the rationale of Judge Kaufman in his dissent [478 F.2d at 825–29], and the opinion of the United States District Court [Gildenhorn v. Lum's Inc., 335 F.Supp. 329 (S.D.N.Y.1971)] comport with Florida law and we would approve Judge Kaufman's reasoning as dispositive of the issues presented sub judice which we answer in the negative.

Since the resolution of these issues disposes of the controversy originally before us, we affirm the judgment below.

## APPENDIX

Not Final Until Time Expires To File Rehearing Petition and, If Filed, Determined.

In the Supreme Court of Florida
January Term, A. D. 1975
Case No. 45,803

United States Court of Appeals
Second Circuit No. 72–1373

———◆———

Jacob Schein and Marvin H. Schein,
*Plaintiffs-Appellants,*

v.

Melvin Chasen, et al.,
*Defendants-Appellees.*

———◆———

Antone F. Gregorio,
*Plaintiff-Appellant,*

v.

Lum's Inc., et al.,
*Defendants-Appellees.*

———◆———

Opinion filed March 13, 1975

Certified Question from the United States Court of Appeal,
Second Circuit

Sidney B. Silverman of Silverman and Harnes, *for Plaintiffs-Appellants.*

Richard Y. Holcomb and James V. Hayes of Donovan, Leisure, Newton and Irvin; Lindsay A. Lovejoy, Jr., Stephen P. Duggan, James J. Hagan and John J. Poggi, Jr. of Simpson, Thacher and Bartlett; and David Hartfield, Jr. and Laura Banfield of White and Case, *for Defendants-Appellees.*

ROBERTS, Justice.

This cause is before us for consideration of questions certified to us by the United States Court of Appeals for the Second Circuit pursuant to Rule 4.61, Florida Appellate Rules. The following questions have been certified:

Are investors, who sell stock on the basis of inside information about the

issuer corporation which they received from a stockbroker who in turn received the information from the president of the issuer corporation, liable to the corporation in a shareholder derivative suit under Florida law for the profits realized by the investors on the sale of that stock?

Is the stockbroker, who relayed the material information from the president of the issuing corporation to the investors, jointly and severally liable with them for the profits they realized on the sale in a shareholder's derivative suit under Florida law?

As appears from the certificate, the pleadings, the decision of the United States District Court, S.D. New York, reported as Gildenhorn v. Lum's Inc., et al., Gregorio v. Lum's, Inc., et al., and Schein v. Chasen, 335 F.Supp. 329 (U.S. D.C., 1971), the opinion of the United States Court of Appeals, Second Circuit, reported as Schein v. Chasen, Gregorio v. Lum's, Inc., et al., 478 F.2d 817 (U.S. C.A., 2 Cir., 1973), and the United States Supreme Court decision reported as Lehman Bros. v. Schein, Simon v. Schein, Investors Diversified Services, Inc., et al. v. Schein, 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974),[1] the nature of the parties, status of the cases, and essential factual background are hereinafter detailed.

The plaintiffs, appellants, Schein, Schein and Gregorio, are shareholders of Lum's, Inc., a Florida corporation (which has subsequent to the filing of their complaints been renamed Caesar's World, Inc.) and sue derivatively on behalf of Lum's, Inc. Invoking the diversity jurisdiction of the court, they sued derivatively in the Southern District of New York alleging that defendants were jointly and severally liable to Lum's for actionable wrongs committed against Lum's. Lum's, Inc. is a nominal defendant in each of the cases. Chasen was, at the time of the events in issue, the chief operating officer of Lum's, Inc. Lehman Brothers (defendant-appellee) was a stock brokerage firm, and Benjamin Simon (defendant-appellee) was a registered representative employed by it in its Chicago office. Investors Diversified Services, Inc. (defendant-appellee) was the investment advisor for Investors Variable Payment Fund, Inc. and IDS New Dimensions Fund, Inc., two mutual funds based in Minneapolis. Eugene Sit was portfolio manager for IDS New Dimensions Fund, Inc., and James Jundt was portfolio manager for Investors Variable Payment Fund, Inc.—both were employees of Investors Diversified Services, Inc. The defendants Chasen, Sit and Jundt were dismissed by the Federal District Court, Southern District of New York, for lack of personal jurisdiction. These dismissals were not appealed and these defendants are no longer involved in the suit.

The District Court dismissed the complaints in these cases, holding that they failed to state a claim under Florida law. The opinion of the District Court is reported sub nom. Gildenhorn v. Lum's, Inc. at 335 F.Supp. 329 (S.D.N.Y.1971). On appeal by the plaintiffs, the Second Circuit Court of Appeals, in a two to one decision, reversed in an opinion reported at 478 F.2d 817 (2d Cir. 1973). The judgment of the Second Circuit Court of Appeals was vacated by the Supreme Court of the United States on April 29, 1974, in an opinion reported at 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974). The cases were remanded so that the Second Circuit Court of Appeals might reconsider whether the controlling issue of Florida law should be certified to the Supreme Court of Florida.

The only question before the United States Court of Appeals is the sufficiency of the complaints to state a cause of action under Florida law.

The following explication of the factual situation alleged in the pleadings as

---

1. Rule 4.61(e), Florida Appellate Rules, provides that "The Supreme Court may, in its discretion, require the original or copies of all or any portion of the record before the federal court to be filed with said certificate where, in its opinion, such record may be necessary in the determination of said cause."

the basis for the controversy sub judice is found in the decision of the Circuit Court of Appeals, 478 F.2d 817:

"In November of 1969 Chasen, who was president and chief operating officer of Lum's, addressed a seminar of about sixty members of the securities industry with reference to Lum's earning prospects for its fiscal year ending July 31, 1970. He informed them that Lum's earnings would be approximately $1.00 to $1.10 per share. On January 5, 1970, he learned that his estimate was too optimistic and that, in fact, Lum's earnings would be only approximately $.76 per share. Three days later, prior to announcing the information to the public, Chasen telephoned Simon in Chicago and told Simon that Lum's would not have as profitable a year as had been expected. He specified to Simon that earnings would be approximately $.76 per share rather than the $1.00 per share which he had earlier announced. Simon knew the information was confidential corporate property which Chasen had not given out publicly. Simon immediately telephoned this information to Sit, an employee of defendant Investors Diversified Services, Inc. (IDS), and Sit immediately telephoned it to Jundt, another employee of IDS. Sit and Jundt managed the stock portfolios of defendant mutual funds Investors Variable Payment Fund, Inc. (Investors) and IDS New Dimensions Fund, Inc. (Dimensions). Upon receiving the information Sit and Jundt directed the Funds to sell their entire stock holdings in Lum's and, on the morning of January 9, 1970, prior to any public announcement, Investors sold 43,000 shares of Lum's and Dimensions sold 40,000 shares. The sales were executed on the New York Stock Exchange at about 10:30 A.M. at a price of approximately $17.50 per share. At 1:30 P.M. on the same day, the New York Stock Exchange halted further trading in Lum's stock pending a company announcement. At 2:45 P.M., Lum's issued a release which appeared on the Dow Jones News Wire Service and announced that the corporation's projected earnings would be lower than had been anticipated. When trad-

ing in Lum's was resumed on Monday, January 12, 1970, volume was heavy and the stock closed at a price of $14.00 per share—$3.50 per share lower than the Funds had realized from the sales of their shares on the previous Friday.

"The present defendants in this case are Lehman Brothers, Simon and the two Mutual Funds. Chasen, Sit, and Jundt have been dismissed as defendants in that they have not been validly served under the New York State Long Arm Statute. Plaintiffs-appellants' theory of recovery is that the participants in this chain of wrongdoing are jointly and severally liable to the corporation under Florida law for misusing corporate information to their own advantage in violation of the duty they owed to Lum's, and that they must account to Lum's for the profits realized by the Mutual Funds. They do not allege in these complaints that defendants have violated any of the federal securities laws, and they concede that the substantive law of Florida governs the rights and liabilities of the parties. They argue, however, that inasmuch as there are no Florida cases directly in point, the Florida court, if it were deciding the case, would look to other jurisdictions and would take a particular and special interest in the decision of Diamond v. Oreamuno, 29 A.D.2d 285, 287 N.Y.S.2d 300 (1st Dep't 1968), aff'd 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969), a case which plaintiffs contend supports the position they urge on this appeal."

Defendants moved to dismiss the consolidated actions upon the ground that the complaints failed to state a claim upon which relief could be granted. Citing Klaxon v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) as authority, the United States District Court looked to the choice of law rules of the State of New York, and found that New York follows the general choice of law principle that the law of the state of incorporation governs the existence and extent of corporate fiduciary obligations. Hausman v. Buckley, 299 F.2d 696, 703 (2d Cir. 1962); Diamond v. Oreamuno, 24 N.Y.2d 494, 301

N.Y.S.2d 78, 248 N.E.2d 910 (1969). The United States District Court proceeded to examine Florida law and concluded that although the Florida Supreme Court has not considered the question presented in the instant cause, several Florida District Courts of Appeal have indicated that a complaint in a stockholders' derivative action which fails to allege both wrongful acts and damage to the corporation must be dismissed. Palma v. Zerbey, 189 So.2d 510, 511 (Fla.App.3, 1966), cert. denied Fla., 200 So.2d 814; Talcott v. McDowell, 148 So.2d 36 (Fla.App.3, 1962); Maronek v. Atlantis Hotel, Inc., 148 So.2d 721 (Fla.App.3, 1963); Citizen's National Bank of St. Petersburg v. Peters, 175 So.2d 54 (Fla.App.2, 1965). Specifically, the United States District Court asserted:

> "Under present Florida case law, a plaintiff in a derivative action must prove that the corporation has been damaged by the alleged breach of fiduciary trust."

The United States District Court considered the possibility that Florida courts might follow the rationale of the New York decision in Diamond v. Oreamuno, supra, and therefore considered whether defendants would be liable under the rationale of *Diamond* and concluded, as follows:

> "It is clear that the complaints in these actions go far beyond the narrow holding of *Diamond.* In that case, the New York Court of Appeals held that a corporate fiduciary is liable for profits which he realizes from a sale of stock motivated by inside information received by him in his corporate position. None of the defendants in these actions fit into this mold. Chasen, as president and chief operating officer of Lum's, was certainly a fiduciary of that corporation. None of the complaints, however, allege that he did anything more than pass the inside information to defendant Simon, and there are no allegations that Chasen sold any of his Lum's stock or derived any gain, monetary or otherwise, from the sales that ultimately occurred. On

the other hand, the mutual fund defendants would have profited if, as alleged, they sold their 83,000 shares of Lum's stock on the basis of Chasen's inside information. It can scarcely be maintained, however, that the mutual fund defendants were officers or directors of Lum's or owed any fiduciary duties whatsoever to that corporation. The broker-dealer defendants fail to come within either of the *Diamond* perimeters as they were not fiduciaries of the corporation and, did not profit by virtue of the sales.

> ". . . As Chief Judge Fuld explained, the purpose of that derivative action was to allow individual shareholders to be '. . . "private attorney General[s]" to . . . enforce proper behavior on the part of corporate officials.' Diamond v. Oreamuno, *supra*, [24 N.Y.2d] at 503, 301 N.Y.S.2d at 85, 248 N.E.2d at 915. It is implicit that the jurisdiction of these 'private attorney generals' would be limited to the corporation in which they are shareholders. It could not, with any logic, be extended in a derivative action to cover outside individuals, corporations, or institutions who are subject to other private and governmental restraints on their behavior. Furthermore, *in affirming the dismissal of the Diamond* complaint against other board members who were alleged to have aided the defendants in concealing their activities, the New York Court of Appeals made it quite clear that *Diamond* extends only to corporate fiduciaries who actually profit by inside information and does not cover aiders and abettors and/or conspirators. In view of the fact that the New York Court of Appeals could not bring itself to find liability for intercorporate conspirators, *I fail to perceive how this court could extend Diamond to cover extra-corporate conspirators and tippees. Accordingly, I conclude that with regard to all defendants save Chasen, the complaints herein fail to state a claim for which relief can be granted.*" (emphasis supplied.)

With regard to Chasen, the District Court opined that as a corporate officer, he may come within the holding of *Diamond*, but that this question need not be reached because service of process on him was improper. The Circuit Court of Appeals by divided vote reversed the District Court and found that although Florida law was controlling, it could find none that was decisive, and, therefore, it turned to the law of New York, in particular *Diamond*, supra. The Circuit Court of Appeal stated its objective to be to interpret *Diamond* as the Florida Court would probably interpret it and apply it to the facts sub judice. The Court of Appeals concluded that defendants had engaged with Chasen to misuse corporate property although the Circuit Court recognized that there was no allegation in the complaints that a prior agreement existed between Chasen and the defendants, and that *Diamond*, supra, encompassed such a situation, and determined that such a construction of *Diamond* would have the "prophylactic effect of providing a disincentive to insider trading." The Circuit Court opined that the cleansing effect of the *Diamond* rationale ought to reach third parties who, through breach of fiduciary relationship, become traders advantageously possessed of confidential insider knowledge, and declared:

"As a court of equity viewing the case as the Florida court would probably view it, we cannot agree that the 'stretch' of *Diamond* does not reach the defendants in this case. We find nothing in the language of *Diamond* to suggest that coventurers of the director who breaches his duty should not be subject to the same liabilities as those of the director himself for the misuse of corporate information. Indeed, the general rule has always been that 'one who knowingly participates in or joins in an enterprise whereby a violation of a fiduciary obligation is effected is liable jointly and severally with the recreant fiduciary.' . . . Moreover, in the light of the corporate interest which the *Diamond* rule is de-

signed to protect, it is immaterial to the preservation of that interest whether the director trades on his own account in the corporation's stock or whether he passes on the information to outsiders who then trade in the corporation's stock. In either event, so long as the director is involved, the prestige and good will of the corporation may be tarnished by the public revelation that the director has been involved in unethical conduct. . . Accordingly, it would be self-defeating to limit the reach of *Diamond* to directors and officers of the injured corporation who have so acted while permitting third-party coventurers of theirs to escape liability to the corporation."

"Judge Kaufman dissented to this decision and explained:

"In my view, it is no longer debatable that trading on inside information merits universal condemnation. The undesirable nature of 'insider trading' is reflected in the prophylactic provisions of Section 16(b) of the Securities Exchange Act of 1934 and the more general antifraud principles of Section 10(b) of that Act. I fully agree with Judges Waterman and Smith that one with access to material inside information concerning a corporation's affairs who knowingly purchases or sells that corporation's shares before this information has become publicly available takes unfair advantage of unknowledgeable parties to the transaction. Indeed, the factual claims contained in the complaints before us have led to two federal actions—an SEC injunctive action and a private class action under rule 10b–5—now pending in the District Court for the Southern District of New York. But the adage that hard facts make bad law is about to come true here, despite Judge, later Justice, Cardozo's warning that judges are not free agents roaming at will to create law to fit the facts. *See* The Nature of the Judicial Process 141 (1921). In the absence of any viable precedent upon which to base the totally new concept of law espoused by my brothers, it is clear

that they announce an extraordinary, expansive, and incorrect reading of New York law solely because of their urge to 'provid[e] a disincentive to insider trading.' I agree with their objective but I question the means employed.

"The court holds today that a person with no relationship whatsoever—fiduciary or otherwise—to a corporation, who trades its shares on the basis of material inside information becomes, *ipso facto*, a fiduciary of the corporation whose shares he traded and, accordingly, may be required in a *shareholders' derivative action*—not a Section 10(b) or 16(b) action—to pay his profits to the corporation. With all due respect to my brothers, the tortured reasoning to which they are compelled to resort in reaching this conclusion represents a distortion of the law of agency and the law of fiduciary responsibility in which I am unable to join. . . . .

\* \* \* \* \* \*

"It is important to note at the outset that the plaintiffs in these actions, shareholders of Lum's, do not claim to have suffered any damages themselves. Rather, these derivative suits are brought 'on behalf of and for the benefit of Lum's.' They seek to recover for Lum's treasury the windfall profit garnered by the IDS mutual funds, and assert that all defendants are jointly and severally liable for this amount. Thus, the proper method of analysis is not to focus on the unfairness of the mutual funds' profit at the expense of their purchasers—who have their own recourse for any wrongdoing—but on the strands of duty running to the corporation from the various individuals involved. The crux of the majority's holding is that the institutional defendants—Lehman Brothers, IDS, and the two mutual funds—and their employees—Simon, Sit, and Jundt—are within the sweep of fiduciary principles announced in Diamond v. Oreamuno, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969). But a careful examination of that case and the principles underlying it demonstrate that *Diamond* is wholly inapposite to this case.

"In *Diamond*, the New York Court of Appeals dealt with a derivative action brought by a shareholder of Management Assistance, Inc. (MAI) against Oreamuno, chairman. of the board of directors of the corporation, and Gonzalez, its president. The complaint charged that by virtue of their corporate positions, these officers knew that a supplier's price increase had caused MAI's earnings to decrease by more than 75% during a one month period. According to the allegations, the two officers sold over 50,000 MAI shares at a price of $28 per share prior to public disclosure of the adverse earnings figures, after which the price per share plummeted to $11. In reviewing the Appellate Division's refusal to order dismissal of the complaint against Oreamuno and Gonzalez, Chief Judge Fuld stated at the outset that 'the question presented—one of first impression in this court—is whether *officers and directors* may be held accountable to their corporation for gains realized by them from transactions in the company's stock as a result of their use of material inside information,' 24 N.Y.2d at 496, 301 N.Y.S.2d at 79, 248 N.E.2d at 911 (emphasis added). A careful reading of the *Diamond* opinion reveals that Oreamuno's and Gonzalez's liability in a stockholders' derivative action was grounded solely in their having breached a fiduciary duty owed by them to MAI as corporate officials.

"The inapplicability of these principles to any of the appellees is readily apparent. *The complaints here are barren of any allegation that the appellees—or Sit or Jundt—occupied any position, such as officer, director, employee, or agent, which would create fiduciary obligations to Lum's.* Compare Brophy v. Cities Service Co., 31 Del.Ch. 241, 70 A.2d 5 (1949); Quinn v. Phipps, 93 Fla. 805, 113 So. 419 (1927). *Liability in Diamond was predicated entirely on such a relationship, and in its absence, the Diamond rationale for liability ceases to exist.*

"In an effort to bridge this fatal gap, the majority, without any basis in law or fact, reasons that the appellees were in-

volved in a 'joint' or 'common enterprise' with Chasen, president of Lum's 'to misuse confidential corporate information for their own enrichment.' By use of this interesting, but nevertheless fictional, theory, they seek to foist upon the appellees liability to Lum's for Chasen's improper behavior. But the facts alleged in the complaints are a far cry from the 'conscious parallelism' cases, drawn from the antitrust field, cited as authority in the majority opinion; the facts simply do not comport with the concept of a joint enterprise, a term which implies the existence of a prior plan to carry out a mutually beneficial project. The complaints, read in the most favorable light to the plaintiffs, disclose nothing more than a seemingly unsolicited and haphazard revelation of certain information which was useful in making investment decisions. There are ample remedies under the federal securities laws to punish this conduct. But, I am unable to understand on what basis the majority transforms the appellees' spontaneous conduct into a nefarious, prearranged, and ongoing scheme so that 'joint' or 'common enterprise' principles can make them liable as fiduciaries of a corporation with which they have no relationship.

"A primary authority upon which the majority relies, § 312 of the American Law Institute's Restatement of Agency 2d, exposes the inappropriateness of holding the appellees liable to Lum's for their conduct. Section 312 provides that 'A person who, without being privileged to do so, intentionally causes or assists an agent to violate a duty to his principal is subject to liability to the principal.' Although Comment c to this section speaks generally of receipt of confidential information by a third person from a principal's agent, the central element of liability is the third party's active and intentional aiding in the agent's violation of a duty owed to his principal. In this case, Chasen's duty to Lum's was to not disclose confidential corporate information. Yet there is not a word in the complaint charging that the appellees actively solicited the disclosure or that

they had concocted a prearranged scheme with Chasen. We are dealing here with an isolated transaction.

"In the absence of any coherent legal theory, I cannot join my brothers in approving the use of the shareholders' derivative action device merely because, as my brothers candidly admit, to do so possibly may have a deterrent effect on 'insider trading.' Although developments in federal securities law indicate an expanding scope of liability for tippee traders, see In re Investors Management Co., Securities and Exchange Commission Release No. 34–9267 (Jul. 29, 1971) (SEC sanctioning of institutional investors who sold a corporation's shares after the corporation's underwriter revealed adverse earnings results to them); cf. SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1308 (2d Cir. 1971), cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1972) (affirming district court order, in SEC injunctive suit, requiring a 'tippor' to divest an amount equal to his tippees' profits), the impetus for developing this expanded federal law liability—whose exact nature and scope remain in a formative stage—is the need to maintain free and honest securities markets. This need appropriately is given great weight when we consider claims under the federal securities law. But it is inapposite in determining whether, *under state common law*, tippee trading is a breach of a fiduciary duty owed to the corporation whose shares are traded, and if so, whether such a breach is remediable through use of a shareholders' derivative action.

\* ── \* \* \* \* \*

"Despite the manner in which the majority opinion convolutes the law and the facts in this case, a view that a tippee is cloaked with state law fiduciary obligations to the corporation whose shares he trades is an unknown and untenable legal concept. *Neither Diamond—itself a significant alteration of the common law principles applicable to an officer's or director's trading in his corporation's shares—nor the law of agency support such a holding.*" (e.s.)

We quote with approval the dissent of Judge Kaufman and we hold it to be responsive and to be dispositive of the controlling questions posited by the United States Circuit Court of Appeals, which we answer in the negative. Not only will we not give the unprecedented expansive reading to *Diamond* sought by appellants but furthermore, we do not choose to adopt the innovative ruling of the New York Court of Appeals in *Diamond*, supra.[2] We adhere to previous precedent established by the courts in this state that actual damage to the corporation must be alleged in the complaint to substantiate a stockholders' derivative action. Palma v. Zerbey, supra, and Citizens National Bank of St. Petersburg v. Peters. In Talcott v. McDowell, supra, the court opined:

"Thus, in order for a complaint to state a cause of action entitling the stockholder to relief, it must allege two distinct wrongs: the act whereby the corporation was caused to suffer damage, and a wrongful refusal by the corporation to seek redress for such act."

Cf. Maronek v. Atlantis Hotel, Inc., supra; Orlando Orange Groves Co., et al. v. Hale, 119 Fla. 159, 161 So. 284 (1935); Seestedt v. Southern Laundry, Inc. et al., 149 Fla. 402, 5 So.2d 859 (1942); Nelson v. Miller, 212 So.2d 66 (Fla.App.3, 1968); Conlee Construction Co. v. Cay Construction Co., 221 So.2d 792 (Fla.App.4, 1969). See also, Stone, et al. v. Holly Hill Fruit Products, Inc., et al., 56 F.2d 553 (5 C.C.A., 1932), Duchaine, et al. v. Grosco Realty, Inc., 121 So.2d 679 (Fla.App.2, 1960).

We note with interest that the Securities and Exchange Commission filed a civil complaint for injunction alleging violation of Section 10(b) of the Securities Exchange Act and Rule 10b–5 against Lum's, Inc., Chasen, Lehman Bros., Simon, Investors Diversified, Sit and Jundt. The United States District Court, Southern District of New York in Securities and Exchange Commission v. Lum's, Inc., et al., 365 F.Supp. 1046 (U.S. D.C., SDNY, 1973), determined that Chasen, although apparently through negligence, breached his duty by transmitting information to Simon and should be liable for the foreseeable consequences of the act, and that the chain of acts outlined by the court in its opinion were sufficient to establish Chasen's liability as a nontrading tipper under Section 10(b) and Rule 10b–5. The District Court concluded that Chasen's act should be imputed to Lum's and held that Lum's was also liable for violation of Section 10(b) and Rule 10b–5. However, the court found that Lehman Bros. was not liable as alleged. Relative to the liability of Lum's for violation of Section 10(b) and Rule 10b–5 and the necessity for an injunction to be directed against Lum's, the District Court explained:

"At the same time, Lum's has no written guidelines for management's dealings with the investment community, or their disclosure of corporation information. And the principal source of revenue for the company, Caesar's Palace, continues to be subject to the wide swings in casino winnings and thus to the speculation which it engenders.

"I am inclined to agree with plaintiff that the precautions and policies described above are inadequate under

---

**2.** See Sections 517.01 et seq., Florida Statutes, particularly Section 517.301, F.S., and Section 517.23, F.S., Blau v. Lehman, 368 U.S. 403, 411, 82 S.Ct. 451, 7 L.Ed.2d 403. In Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972), the Supreme Court of the United States expressly stated:

"As we said in Blau v. Lehman, 368 U.S. 403, 411, 82 S.Ct. 451, 456, 7 L.Ed.2d 403, one 'may agree that . . . the Commission present[s] persuasive policy arguments that the Act should be broadened . . .

to prevent 'the unfair use of information' more effectively than can be accomplished by leaving the Act so as to require forfeiture of profits only by those specifically designated by Congress to suffer those losses.' But we are not free to adopt a construction that not only strains, but flatly contradicts, the words of the statute."

See Haberman v. Murchison, 468 F.2d 1305 (U.S.C.A. 2d Cir., 1972). Cf. Fordham Law Review, 480 Notes, 1970 Wisconsin Law Review 576 Notes.

the circumstances, particularly where there have been problems with leaks of corporate information on several occasions and protestations of innocence concerning the instant violation. In sum, I find that there is a reasonable likelihood that 10b–5 violations will be repeated, even if only inadvertently. Lum's (Caesar's World) should be enjoined from violating the securities acts in such manner in the future, and it should be directed to establish written guidelines for the dissemination of corporate information to the investment community."

Accordingly, we find that the rationale of Judge Kaufman in his dissent and the opinion of the United States District Court comport with Florida law and we would approve Judge Kaufman's reasoning as dispositive of the issues presented sub judice which we answer in the negative. Cf. Beach v. Williamson, 78 Fla. 611, 83 So. 860 (1920); Logan, et al. v. Arnold, 82 Fla. 237, 89 So. 551 (1921); Quinn v. Phipps, 93 Fla. 805, 113 So. 419 (1927); Chipola Valley Realty Co. v. Griffin et al., 94 Fla. 1151, 115 So. 541 (1927); Connelly v. Special Road & Bridge Dist. No. 5, 99 Fla. 456, 126 So. 794 (1930); McGregor v. Provident Trust Co. of Philadelphia, 119 Fla. 718, 162 So. 323 (1935); News Journal Corp., et al. v. Gore, 147 Fla. 217, 2 So.2d 741 (1941); Pure Foods, Inc. v. Sir Sirloin, 84 So.2d 51 (Fla.1955); Pan American Trading & Trapping Inc. v. Crown Paint, Inc., 99 So.2d 705 (Fla.1958); Flight Equipment and Engineering Corporation v. Shelton, 103 So.2d 615 (Fla.1958); Doeg v. Thornton, 174 So.2d 570 (Fla.App.3, 1965); Etheredge v. Barrow, 102 So.2d 660 (Fla. App.2, 1958); Independent Optical Co. of Winter Haven, et al. v. Elmore, 289 So.2d 24 (Fla.App.2, 1974); Renpak, Inc. v. Oppenheimer, 104 So.2d 642 (Fla. App.2, 1958). We would not extend the innovative ruling of the New York Court of Appeals in *Diamond*, supra.

We conclude that under the facts alleged in the complaint, Florida law does not permit the maintenance of shareholders' derivative suit on behalf of Lum's.

ADKINS, C. J., and McCAIN and OVERTON, JJ., concur.

ENGLAND, J., concurs specially with opinion.

ENGLAND, Justice (concurring specially).

I would answer both certified questions in the negative on the narrow grounds (i) that Florida law requires an allegation of corporate damage as a predicate to the maintenance of a shareholder's derivative suit,[1] and (ii) that an action for civil damages must allege more than merely speculative damages.[2] In this case plaintiffs' allegation of damage is to the effect that Lum's, Inc. sustained immeasurable damages as a result of open market transactions in its stock by defendant-tippee investor, acting on inside information furnished by defendant-tipped stockbroker. It is speculative at best to find corporate financial loss in the market price depression occasioned by these transactions.[3]

---

**1.** Decisions of the Florida district courts of appeal are conclusive on questions of Florida law when not in conflict with other decisions of this Court. Fla.Const., art. V, §§ 4(b)(1) and 3(b)(3); Ansin v. Thurston, 101 So.2d 808 (Fla. 1958). There being no decisions of this Court on the elements of a shareholder's derivative suit, their identification in decisions of the district courts of appeal are determinative. Conlee Constr. Co. v. Cay Constr. Co., 221 So.2d 792 (4th Dist.Ct.App.Fla.1969) (dictum); Nelson v. Miller, 212 So.2d 66 (3d Dist.Ct.App.Fla. 1968); Palma v. Zerbey, 189 So.2d 510 (3d Dist.Ct.App.Fla.1966), cert. denied, 200 So.2d 814 (Fla.1967); Citizens Nat'l Bank v. Peters, 175 So.2d 54 (2d Dist.Ct.App.Fla.1965); Maronek v. Atlantis Hotel, Inc., 148 So.2d 721 (3d Dist.Ct.App.Fla.1963); James Talcott, Inc. v. McDowell, 148 So.2d 36 (3d Dist.Ct.App.Fla. 1962).

**2.** See Gilliland v. Mercantile Inv. & Holding Co., 147 Fla. 613, 3 So.2d 148 (1941).

**3.** The speculative nature of possible corporate damage is compounded by the fact that trading in the company's stock was suspended on the very afternoon of defendant's sales for a company announcement, which proved to be the "tipped" news of reduced corporate earnings.